# CARTER ET AL. *v.* JURY COMMISSION OF GREENE COUNTY ET AL.

No. 30.   Argued October 21, 1969—Decided January 19, 1970

*Norman C. Amaker* argued the cause for appellants. With him on the briefs were *Jack Greenberg* and *Orzell Billingsley, Jr.*

*Leslie Hall* argued the cause for appellees. On the brief were *MacDonald Gallion,* Attorney General of Alabama, and *Robert P. Bradley* and *Jasper B. Roberts,* Assistant Attorneys General.

MR. JUSTICE STEWART delivered the opinion of the Court.

The appellants, Negro citizens of Greene County, Alabama, commenced this class action against officials charged with the administration of the State's jury-

selection laws: the county jury commissioners and their clerk, the local circuit court judge, and the Governor of Alabama. The complaint alleged that the appellants were fully qualified to serve as jurors and desired to serve, but had never been summoned for jury service. It charged that the appellees had effected a discriminatory exclusion of Negroes from grand and petit juries in Greene County—the Governor in his selection of the county jury commission, and the commissioners and judge in their arbitrary exclusion of Negroes. The complaint sought (1) a declaration that qualified Negroes were systematically excluded from Greene County grand and petit juries, that the Alabama statutes governing jury selection were unconstitutional on their face and as applied, and that the jury commission was a deliberately segregated governmental agency; (2) a permanent injunction forbidding the systematic exclusion of Negroes from Greene County juries pursuant to the challenged statutes and requiring that all eligible Negroes be placed on the jury roll; and (3) an order vacating the appointments of the jury commissioners and compelling the Governor to select new members without racial discrimination.

Alabama's jury-selection procedure is governed by statute. Ala. Code, Tit. 30, § 1 *et seq.* (1958 and Supp. 1967). The Governor appoints a three-member jury commission for each county. §§ 8–10. The commission employs a clerk, § 15, who is charged with the duty of obtaining the name of every citizen of the county over 21 and under 65 years of age, together with his occupation and places of residence and business. § 18. The clerk must "scan the registration lists, the lists returned to the tax assessor, any city directories, telephone directories and any and every other source of information from which he may obtain information . . . ." § 24. He must also "visit every precinct at least once a year

to enable the jury commission to properly perform the duties required of it . . . ." *Ibid.*[1] Once the clerk submits his list of names, the commission is under a duty to prepare a jury roll and jury box containing the names of all qualified, nonexempt citizens in the county, §§ 20, 24, who are "generally reputed to be honest and intelligent and are esteemed in the community for their integrity, good character and sound judgment . . . ." § 21.[2]

---

[1] "The sole purpose of these requirements is to insure that the jury commissioners will have as complete a list as possible of names, compiled on an objective basis, from which to select qualified jurors." *Mitchell* v. *Johnson,* 250 F. Supp. 117, 123.

[2] The commission may not select any person who is under 21, a habitual drunkard, unfit to discharge a juror's duties because afflicted with a permanent disease or physical weakness, or unable to read English, nor anyone who has been convicted of an offense involving moral turpitude. A person who would be disqualified only because he cannot read English is still eligible for jury service if he is a freeholder or householder. A person over 65 may not be required to serve but is eligible if he is willing to do so. § 21. The commission is also required to exempt various classes of persons, based on their occupation, unless they consent to serve. § 3. In addition, the court may excuse any person who appears to be unfit to serve on a jury, or who is disqualified or exempt, "or for any other reasonable or proper cause . . . ." §§ 4, 5.

Until 1966 only men were eligible for service. The blanket exclusion of women was declared unconstitutional in *White* v. *Crook,* 251 F. Supp. 401, 408–409; thereafter Alabama amended its statutes to render women eligible. § 21 (1). The trial judge may, however, excuse them from jury duty for good cause shown. § 21.

The requirement that the commission place the name of every qualified, nonexempt person on the jury roll is permissive, not mandatory, in that the jury commission's failure to do so does not, absent fraud or denial of constitutional rights, compel the quashing of the indictment or venire. *Fikes* v. *State,* 263 Ala. 89, 95, 81 So. 2d 303, 309, rev'd on other grounds, 352 U. S. 191; see *Swain* v. *Alabama,* 380 U. S. 202, 207 n. 3; *White* v. *Crook, supra,* at 403 n. 6; *Mitchell* v. *Johnson, supra,* at 119 n. 5.

A three-judge District Court, convened pursuant to 28 U. S. C. §§ 2281 and 2284, conducted an extensive evidentiary hearing on the appellants' complaint. The record fully supports the trial court's conclusion, set out in its detailed opinion, that the jury-selection process as it actually operated in Greene County at the outset of this litigation departed from the statutory mandate in several respects:

> "The clerk does not obtain the names of all potentially eligible jurors as provided by § 18, in fact was not aware that the statute directed that this be done and knew of no way in which she could do it. The starting point each year is last year's roll. Everyone thereon is considered to be qualified and remains on the roll unless he dies or moves away (or, presumably, is convicted of a felony). New names are added to the old roll. Almost all of the work of the commission is devoted to securing names of persons suggested for consideration as new jurors. The clerk performs some duties directed toward securing such names. This is a part-time task, done without compensation, in spare time available from performance of her duties as clerk of the Circuit Court. She uses voter lists but not the tax assessor's lists. Telephone directories for some of the communities are referred to, city directories not at all since Greene County is largely rural.
>
> "The clerk goes into each of the eleven beats or precincts annually, usually one time. Her trips out into the county for this purpose never consume a full day. At various places in the county she talks with persons she knows and secures suggested names. She is acquainted with a good many Negroes, but very few 'out in the county.' She does not know the reputation of most of the Negroes in the county. Because of her duties as clerk of the Circuit Court

the names and reputations of Negroes most familiar to her are those who have been convicted of crime or have been 'in trouble.' She does not know any Negro ministers, does not seek names from any Negro or white churches or fraternal organizations. She obtains some names from the county's Negro deputy sheriff.

"The commission members also secure some names, but on a basis no more regular or formalized than the efforts of the clerk. The commissioners 'ask around,' each usually in the area of the county where he resides, and secure a few names, chiefly from white persons. Some of the names are obtained from public officials, substantially all of whom are white.

"One commissioner testified that he asked for names and that if people didn't give him names he could not submit them. He accepts pay for one day's work each year, stating that he does not have a lot of time to put on jury commission work. . . . He takes the word of those who recommend people, checks no further and sees no need to check further, considering that he is to rely on the judgment of others. He makes no inquiry or determination whether persons suggested can read or write . . . . Neither commissioners nor clerk have any social contacts with Negroes or belong to any of the same organizations.

"Through its yearly meeting in August, 1966, the jury commission met once each year usually for one day, sometimes for two, to prepare a new roll. New names presented by clerk and commissioners, and some sent in by letter, were considered. The clerk checked them against court records of felony convictions. New names decided upon as acceptable were added to the old roll. The names of those

on the old roll who had died or moved away were removed.

"At the August, 1966 meeting one commissioner was new and submitted no names, white or Negro, and merely did clerical work at the meeting. Another had been ill and able to seek names little if at all. The third could remember one Negro name that he suggested. This commissioner brought the name, or names, he proposed on a trade bill he had received, and after so using it threw it away. All lists of suggested names were destroyed. As a result of that meeting the number of Negro names on the jury roll increased by 37. . . . Approximately 32 of those names came from lists given the clerk or commissioners by others. The testimony is that at the one-day August meeting the entire voter list was scanned. It contained the names of around 2,000 Negroes.

"Thus in practice, through the August, 1966 meeting the system operated exactly in reverse from what the state statutes contemplate. It produced a small group of individually selected or recommended names for consideration. Those potentially qualified but whose names were never focused upon were given no consideration. Those who prepared the roll and administered the system were white and with limited means of contact with the Negro community. Though they recognized that the most pertinent information as to which Negroes do, and which do not, meet the statutory qualifications comes from Negroes there was no meaningful procedure by which Negro names were fed into the machinery for consideration or effectual means of communication by which the knowledge possessed by the Negro community was utilized. In practice most of the work of the commission has been de-

voted to the function of securing names to be considered. Once a name has come up for consideration it usually has been added to the rolls unless that person has been convicted of a felony. The function of applying the statutory criteria has been carried out only in part, or by accepting as conclusive the judgment of others, and for some criteria not at all." [3]

The District Court's further findings demonstrated the impact of the selection process on the racial composition of Greene County juries. According to the 1960 census, Negroes composed three-fourths of the county's population. Yet from 1961 to 1963 the largest number of Negroes ever to appear on the jury list was about 7% of the total. The court noted that in 1964 a single-judge federal district court had entered a declaratory judgment setting forth the duties of the jury commissioners and their clerk under Alabama law, instructing them not to pursue a course of conduct operating to discriminate against Negroes, forbidding them to employ numerical or proportional limitations with respect to race, and directing an examination of the jury roll for compliance with the judgment.[4] Thereafter, the situation had improved only marginally. In 1966 only 82 Negroes appeared among the 471 citizens listed on the jury roll; 50% of the white male population of the county found its way to the jury roll in that year, but only 4% of the Negro.[5] In 1967, following a statutory amendment, the commission added women to the jury roll. Upon the expansion of the list, Negroes composed 388 of the

[3] *Bokulich* v. *Jury Commission of Greene County,* 298 F. Supp. 181, 187–188. (Footnotes omitted.)

[4] *Coleman* v. *Barton,* No. 63–4 (N. D. Ala. 1964). The opinion is unreported. See 298 F. Supp., at 184.

[5] In 1966 Alabama still limited jury service to males. See n. 2, *supra.*

1,198 potential jurors—still only 32% of the total, even though the 1967 population of the county was estimated to be about 65% Negro.[6]

The District Court found that "there is invalid exclusion of Negroes on a racially discriminatory basis." It enjoined the jury commissioners and their clerk from systematically excluding Negroes from the jury roll, and directed them "to take prompt action to compile a jury list . . . in accordance with the laws of Alabama and . . . constitutional principles"; to file a jury list so compiled within 60 days, showing the information required by Alabama law for each potential juror, together with his race and, if available, his age; and to submit a report setting forth the procedure by which the commission had compiled the list and applied the statutory qualifications and exclusions.

The court declined, however, either to enjoin the enforcement of the challenged Alabama statutory provisions or to direct the Governor to appoint Negroes to the jury commission. From these rulings the appellants took a direct appeal to this Court pursuant to 28 U. S. C. § 1253. We noted probable jurisdiction. 393 U. S. 1115.[7]

---

[6] The District Court rejected the appellees' contention that an emigration of younger and better-educated Negroes from the county in the 1960's accounted for the disparity between the racial composition of the county in 1960 and of the jury rolls during the succeeding years of the decade. 298 F. Supp., at 188. See *Coleman* v. *Alabama*, 389 U. S. 22, 23.

[7] Other plaintiffs in the suit sought similar relief, as well as an injunction to prevent the grand jury from considering charges of grand larceny then outstanding against them. The District Court denied relief with respect to those plaintiffs, and they took a separate appeal. We affirmed that portion of the District Court's judgment last Term, and those plaintiffs are no longer before us. *Bokulich* v. *Jury Commission of Greene County*, 394 U. S. 97 (*per curiam*).

# I

This is the first case to reach the Court in which an attack upon alleged racial discrimination in choosing juries has been made by plaintiffs seeking affirmative relief, rather than by defendants challenging judgments of criminal conviction on the ground of systematic exclusion of Negroes from the grand juries that indicted them,[8] the trial juries that found them guilty,[9] or both.[10]  The District Court found no barrier to such a suit, and neither do we.  Defendants in criminal proceedings do not have the only cognizable legal interest in nondiscriminatory jury selection.  People excluded from juries because of their race are as much aggrieved as those indicted and tried by juries chosen under a system of racial exclusion.[11]

---

[8] *Arnold* v. *North Carolina,* 376 U. S. 773 (*per curiam*); *Eubanks* v. *Louisiana,* 356 U. S. 584; *Reece* v. *Georgia,* 350 U. S. 85, 87; *Cassell* v. *Texas,* 339 U. S. 282; *Hill* v. *Texas,* 316 U. S. 400, 404, 406; *Smith* v. *Texas,* 311 U. S. 128, 129–130; *Pierre* v. *Louisiana,* 306 U. S. 354, 356–358, 362; *Rogers* v. *Alabama,* 192 U. S. 226, 231; *Carter* v. *Texas,* 177 U. S. 442, 447; *Bush* v. *Kentucky,* 107 U. S. 110, 121.

[9] *Avery* v. *Georgia,* 345 U. S. 559; *Hollins* v. *Oklahoma,* 295 U. S. 394 (*per curiam*).

[10] *Sims* v. *Georgia,* 389 U. S. 404, 407–408; *Whitus* v. *Georgia,* 385 U. S. 545; *Swain* v. *Alabama,* 380 U. S. 202; *Coleman* v. *Alabama,* 377 U. S. 129; *Patton* v. *Mississippi,* 332 U. S. 463; *Hale* v. *Kentucky,* 303 U. S. 613 (*per curiam*); *Norris* v. *Alabama,* 294 U. S. 587, 589; *Martin* v. *Texas,* 200 U. S. 316, 319; *Neal* v. *Delaware,* 103 U. S. 370, 396–397; *Strauder* v. *West Virginia,* 100 U. S. 303.

[11] *Billingsley* v. *Clayton,* 359 F. 2d 13, 16 (*en banc*); *Jewell* v. *Stebbins,* 288 F. Supp. 600, 604–605; *White* v. *Crook,* 251 F. Supp. 401, 405–406; *Mitchell* v. *Johnson,* 250 F. Supp. 117, 121.  See Kuhn, Jury Discrimination: The Next Phase, 41 S. Cal. L. Rev. 235, 247–249; Note, The Congress, The Court and Jury Selection: A Critique of Titles I and II of the Civil Rights Bill of 1966, 52 Va. L. Rev. 1069, 1084–1094 (1966).

Surely there is no jurisdictional or procedural bar to an attack upon systematic jury discrimination by way of a civil suit such as the one brought here. The federal claim is bottomed on the simple proposition that the State, acting through its agents, has refused to consider the appellants for jury service solely because of their race. Whether jury service be deemed a right, a privilege, or a duty, the State may no more extend it to some of its citizens and deny it to others on racial grounds than it may invidiously discriminate in the offering and withholding of the elective franchise.[12]  Once the State chooses to provide grand and petit juries, whether or not constitutionally required to do so,[13] it must hew to federal constitutional criteria in ensuring that the selection of membership is free of racial bias.[14]  The exclusion of Negroes from jury service because of their race is "practically a brand upon them . . . , an assertion of their inferiority . . . ."[15]  That kind of discrimination contravenes the very idea of a jury—"a body truly representative of the community,"[16] composed of "the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds."[17]

---

[12] Cf. *Carrington* v. *Rash,* 380 U. S. 89, 91; *Lassiter* v. *Northampton County Board of Elections,* 360 U. S. 45, 50–51; *Pope* v. *Williams,* 193 U. S. 621, 632.

[13] Compare *Duncan* v. *Louisiana,* 391 U. S. 145, with *Hurtado* v. *California,* 110 U. S. 516.

[14] See *Ex parte Virginia,* 100 U. S. 339, 346–347; *Virginia* v. *Rives,* 100 U. S. 313, 321.

[15] *Strauder* v. *West Virginia, supra,* at 308.

[16] *Smith* v. *Texas, supra,* at 130.

[17] *Strauder* v. *West Virginia, supra.* Congress, recognizing such a right, has long provided a criminal sanction for its violation:

"No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or

## II

On the merits, the appellants argue that the District Court erred in refusing to invalidate the Alabama statute requiring the jury commissioners to select for jury service those persons who are "generally reputed to be honest and intelligent and . . . esteemed in the community for their integrity, good character and sound judgment . . . ." Ala. Code, Tit. 30, § 21 (Supp. 1967). The appellants say § 21 is unconstitutional on its face because, by leaving Alabama's jury officials at large in their selection of potential jurors, it provides them an opportunity to discriminate on the basis of race—an opportunity of which they have in fact taken advantage.[18] Specifically, the charge is that § 21 leaves the commissioners free to give effect to their belief that Negroes are generally inferior to white people and so less likely to measure up to the statutory requirements;[19] to the commissioners' fear that white people in the community will suffer if Negroes are accorded the opportunity to exercise the power of their majority;[20] and to the commissioners' preference for Negroes who tend not to assert their right to legal and social equality.[21] The appellants say the injunctive relief granted by the District Court is inadequate, because the history of jury selection in Greene County demonstrates a practice of

petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude; and whoever, being an officer or other person charged with any duty in the selection or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000." 18 U. S. C. § 243.

[18] Cf. *Whitus* v. *Georgia, supra,* at 552.

[19] Cf. *Witcher* v. *Peyton,* 405 F. 2d 725, 727.

[20] Cf. *Gray* v. *Main,* 309 F. Supp. 207, 224.

[21] Cf. *Brooks* v. *Beto,* 366 F. 2d 1, 27 (Wisdom, J., concurring in result), cert. denied, 386 U. S. 975.

discrimination persisting despite the federal court's prior grant of declaratory relief. Moreover, so long as § 21 remains the law, it is argued, Negro citizens throughout Alabama will be obliged to attack the jury-selection process on a county-by-county basis, thereby imposing a heavy burden on already congested court dockets and delaying the day that Alabama will be free of discriminatory jury selection.[22]

While there is force in what the appellants say, we cannot agree that § 21 is irredeemably invalid on its face. It has long been accepted that the Constitution does not forbid the States to prescribe relevant qualifications for their jurors.[23] The States remain free to confine the selection to citizens, to persons meeting specified qualifications of age and educational attainment,[24] and to those possessing good intelligence, sound judgment, and fair character.[25] "Our duty to protect the federal constitutional rights of all does not mean we must or should impose on states our conception of the proper source of jury lists, so long as the source reasonably reflects a cross-section of the popula-

---

[22] According to the appellants, civil suits challenging alleged racial discrimination in jury selection have been commenced in federal district courts throughout Alabama.

[23] *Brown* v. *Allen,* 344 U. S. 443, 473 (opinion of Mr. Justice Reed, announcing judgment); *Cassell* v. *Texas, supra,* at 291 (Frankfurter, J., concurring in judgment); *Virginia* v. *Rives, supra,* at 334–335 (Field J., concurring in judgment); *Strauder* v. *West Virginia, supra,* at 310.

[24] *Neal* v. *Delaware, supra,* at 386; *Strauder* v. *West Virginia, supra.*

[25] *Gibson* v. *Mississippi,* 162 U. S. 565, 589. The federal courts have upheld similar qualifications in reviewing their own jury-selection system. See, *e. g., United States* v. *Flynn,* 216 F. 2d 354, 388 (C. A. 2d Cir.) (Harlan, J.), cert. denied, 348 U. S. 909; *United States* v. *Dennis,* 183 F. 2d 201, 220 (C. A. 2d Cir.) (L. Hand, J.), cert. granted, limited to other grounds, 340 U. S. 863.

tion suitable in character and intelligence for that civic duty." [26]

Statutory provisions such as those found in § 21 are not peculiar to Alabama, or to any particular region of the country. Nearly every State requires that its jurors be citizens of the United States,[27] residents of the locality,[28] of a specified minimum age,[29] and able to understand English.[30] Many of the States require that jurors be of "good character" or the like; [31] some, that they be "intelligent" [32] or "well informed." [33]

---

[26] *Brown* v. *Allen, supra,* at 474 (opinion of Mr. Justice Reed, announcing judgment).

[27] See, *e. g.,* Ariz. Rev. Stat. Ann. § 21–201 (1956); Wis. Stat. Ann. § 255.01 (1) (Supp. 1969).

[28] See, *e. g.,* Cal. Civ. Pro. Code § 198 (1954); Wash. Rev. Code § 2.36.070 (2) (1956).

[29] *E. g.,* Colo. Rev. Stat. Ann. § 78–1–1 (1) (1963) (21 years old); Md. Ann. Code, Art. 51, § 1 (1968 Repl. Vol.) (25 years); Hawaii Rev. Stat. § 609–1 (1) (1968) (20 years); Neb. Rev. Stat. § 25–1601 (1) (1964) (25 years); R. I. Gen. Laws Ann. § 9–9–1 (1956) (same).

[30] See, *e. g.,* Pa. Stat. Ann., Tit. 17, § 1322 (1962). Vermont has delegated the function of determining qualifications to court administrators. Vt. Stat. Ann., Tit. 4, § 902 (Supp. 1969).

[31] Ariz. Rev. Stat. Ann. § 21–201 (1956); Ark. Stat. Ann. § 39–206 (1962 Repl. Vol.); Conn. Gen. Stat. Rev. § 51–217 (1968); Fla. Stat. § 40.01 (3) (1965); Hawaii Rev. Stat. § 609–1 (3) (1968); Ill. Rev. Stat., c. 78, § 2 (1967) ("fair character"); Iowa Code § 607.1 (1966); Kan. Stat. Ann. § 43–102 (1964); Ky. Rev. Stat. § 29.025 (1962) ("temperate, discreet, and of good demeanor"); Me. Rev. Stat. Ann., Tit. 14, § 1254 (1964); Neb. Rev. Stat. § 25–1601 (1) (1964) ("fair character"); N. Y. Judiciary Law § 504 (4) (Supp. 1969); Okla. Stat. Ann., Tit. 38, § 28 (Supp. 1969); S. C. Code Ann. § 38–52 (Supp. 1968); Tex. Rev. Civ. Stat. Ann., Art. 2133 (2) (1964); Wis. Stat. Ann. § 255.01 (5) (Supp. 1969).

Another phrase frequently found is "approved integrity." *E. g.,* Conn. Gen. Stat. Rev. § 51–217 (1968); Fla. Stat. § 40.01 (3) (1965); Ill. Rev. Stat., c. 78, § 2 (1967); Kan. Stat. Ann. § 43–102

Provisions of similar breadth have been challenged here and sustained before. In *Franklin* v. *South Carolina*,[34] the Court rejected a similar attack upon a jury-selection statute alleged by the plaintiff in error to have conferred arbitrary power upon the jury commissioners. The pertinent law there provided that the commissioners should

(1964); Me. Rev. Stat. Ann., Tit. 14, § 1254 (1964); Neb. Rev. Stat. § 25–1601 (1) (1964). See also Ariz. Rev. Stat. Ann. § 21–201 (1956) ("sober"); Md. Ann. Code, Art. 51, § 9 (Supp. 1968) ("integrity"); Miss. Code Ann. § 1762–02 (Supp. 1968) (not a "habitual drunkard"); Mo. Ann. Stat. § 494.010 (Supp. 1969) ("sober"); Okla. Stat. Ann., Tit. 38, § 28 (Supp. 1969) (not a habitual drunkard); Tenn. Code Ann. § 22–102 (1955) (same); W. Va. Code Ann. § 52–1–2 (1966) (same); cf. N. H. Rev. Stat. Ann. § 500:29 (1968 Repl. Vol.) (disqualification on account of "vicious habits"); Wash. Rev. Code § 2.36.110 (1959) ("unfit persons" must be excused).

[32] Ariz. Rev. Stat. Ann. § 21–201 (1956); Cal. Civ. Pro. Code § 198 (1954); Fla. Stat. § 40.01 (3) (1965); Hawaii Rev. Stat. § 609–1 (3) (1968); Md. Ann. Code, Art. 51, § 9 (Supp. 1968); Mo. Ann. Stat. § 494.010 (Supp. 1969); Mont. Rev. Codes Ann. § 93–1301 (2) (1964 Repl. Vol.); Neb. Rev. Stat. § 25–1601 (1) (1964); N. Y. Judiciary Law § 596 (5) (1968) (only for cities of one million in population); Wyo. Stat. Ann. § 1–77 (2) (Supp. 1969). See also Conn. Gen. Stat. Rev. § 51–217 (1968) ("sound judgment"); Fla. Stat. § 40.01 (3) (1965) (same); Ill. Rev. Stat., c. 78, § 2 (1967) (same); Iowa Code § 607.1 (1966) (same); Me. Rev. Stat. Ann., Tit. 14, § 1254 (1964) (same); N. D. Cent. Code § 27–09–01 (1960) ("sound mind and discretion"); Okla. Stat. Ann., Tit. 38, § 28 (Supp. 1969) (same); S. C. Code Ann. § 38–52 (Supp. 1968) ("sound judgment"); Utah Code Ann. § 78–46–8 (5) (1953) ("sound mind and discretion"); Wis. Stat. Ann. § 255.01 (5) (Supp. 1969) ("sound judgment").

[33] Ill. Rev. Stat., c. 78, § 2 (1967); Kan. Stat. Ann. § 43–102 (1964); Me. Rev. Stat. Ann., Tit. 14, § 1254 (1964); Neb. Rev. Stat. § 25–1601 (1) (1964); see Conn. Gen. Stat. Rev. § 51–217 (1968) ("fair education"). See Note, The Congress, The Court and Jury Selection: A Critique of Titles I and II of the Civil Rights Bill of 1966, 52 Va. L. Rev. 1069, 1072–1073 (1966) (collecting references).

[34] 218 U. S. 161.

"prepare a list of such qualified electors under the provisions of the constitution, between the ages of twenty-one and sixty-five years, and of good moral character, of their respective counties as they may deem otherwise well qualified to serve as jurors, being persons of sound judgment and free from all legal exceptions, which list shall include not less than one from every three of such qualified electors . . . ." In upholding the validity of these standards, the Court said:

> "We do not think there is anything in this provision of the statute having the effect to deny rights secured by the Federal Constitution. . . . There is nothing in this statute which discriminates against individuals on account of race or color or previous condition, or which subjects such persons to any other or different treatment than other electors who may be qualified to serve as jurors. The statute simply provides for an exercise of judgment in attempting to secure competent jurors of proper qualifications." [35]

Again, in *Smith* v. *Texas*,[36] we dealt with a statute leaving a wide range of choice to the commissioners.[37] Yet we expressly upheld the validity of the law. The statutory scheme was not in itself unfair; it was "capable of being carried out with no racial discrimination whatsoever." [38]

No less can be said of the statutory standards attacked in the present case. Despite the overwhelming proof the appellants have adduced in support of their claim

---

[35] 218 U. S., at 167–168.

[36] 311 U. S. 128.

[37] See *Akins* v. *Texas*, 325 U. S. 398, 402–403 and n. 3.

[38] 311 U. S., at 130–131. (Footnote omitted.) Cf. *Hernandez* v. *Texas*, 347 U. S. 475, 478–479, and *Cassell* v. *Texas, supra,* at 284, where no challenge was made to the statutory scheme.

that the jury clerk and commissioners have abused the discretion that Alabama law confers on them in the preparation of the jury roll, we cannot say that § 21 is necessarily and under all circumstances invalid. The provision is devoid of any mention of race.[39] Its antecedents are of ancient vintage,[40] and there is no suggestion that the law was originally adopted or subsequently carried forward for the purpose of fostering racial discrimination.[41] The federal courts are not incompetent to fashion detailed and stringent injunctive relief that will remedy any discriminatory application of the statute

---

[39] From the earliest consideration of racial discrimination in jury selection, the Court has consistently distinguished, for purposes of determining the removability of a state criminal proceeding to a federal court, between a statute expressly excluding Negroes from jury service and one neutral on its face with respect to race but challenged as discriminatorily applied. Compare *Murray* v. *Louisiana,* 163 U. S. 101, 105–106; *Smith* v. *Mississippi,* 162 U. S. 592, 600; *Gibson* v. *Mississippi, supra,* at 579–586; *Bush* v. *Kentucky, supra,* at 116; *Neal* v. *Delaware, supra,* at 386–393; *Virginia* v. *Rives, supra,* at 318–323, with *Strauder* v. *West Virginia, supra,* at 310–312. See *City of Greenwood* v. *Peacock,* 384 U. S. 808, 827–828; *Georgia* v. *Rachel,* 384 U. S. 780, 797–804.

[40] See Ala. Pen. Code of 1841, c. X, §§ 1, 3.

[41] Such considerations distinguish the present case from *Louisiana* v. *United States,* 380 U. S. 145, where we invalidated a provision of the Louisiana Constitution that vested in the State's voting registrars "a virtually uncontrolled discretion as to who should vote and who should not," and that had been abused "to deprive otherwise qualified Negro citizens of their right to vote . . . ." 380 U. S., at 150. The District Court found that the constitutional provision, as written and as applied, was "part of a successful plan to deprive Louisiana Negroes of their right to vote." 380 U. S., at 151, aff'g 225 F. Supp. 353, 356, 363–381. Cf. *South Carolina* v. *Katzenbach,* 383 U. S. 301, 312–313; *United States* v. *Mississippi,* 380 U. S. 128, 131–136, 143–144; *Alabama* v. *United States,* 371 U. S. 37, *per curiam,* aff'g 304 F. 2d 583, 584–589, aff'g 192 F. Supp. 677; *Schnell* v. *Davis,* 336 U. S. 933, *per curiam,* aff'g 81 F. Supp. 872, 876, 878–880.

at the hands of the officials empowered to administer it.[42]   In sum, we cannot conclude, even on so compelling a record as that before us, that the guarantees of the Constitution can be secured only by the total invalidation of the challenged provisions of § 21.

### III

The appellants also attack the composition of the Greene County jury commission.  They urge that the record demonstrates the causal relation between the conceded absence of Negroes from the commission for at least the past decade and the systematic racial discrimination in the selection of potential jurors established before the District Court.  It is argued that even the best-intentioned white jury commissioners are unlikely to know many Negroes who satisfy the statutory qualifications and that white jury officials in Alabama generally regard Negroes as incapable of satisfying the prerequisites for jury membership.  Having shown a course of continuing and consistent disregard of statutory and constitutional standards on the part of the Greene County jury commissioners and the clerk, the appellants contend that if the discretionary provisions of § 21 are to remain the law, it is essential that the jury commission be representative of the community in which it functions, particularly in an area such as Greene County, where Negroes constitute a majority of the population. The District Court erred, the appellants say, in not ordering the Governor of Alabama to appoint Negroes to the Greene County jury commission.

---

[42] In *Louisiana* v. *United States, supra,* the District Court held the challenged constitutional provision invalid *per se* on the basis of its finding that in view of the provision's "vote-abridging purpose and effect," its vices could not be cured by an injunction prohibiting its unfair application.  225 F. Supp., at 391, aff'd, 380 U. S., at 150 and n. 9.  Cf. *Davis* v. *Schnell,* 81 F. Supp., at 877.

The claim was not presented to the District Court in precisely these terms. There the appellants did not urge that white commissioners could not perform their statutory task in an unbiased manner in a predominantly Negro county. Rather, they contended that the Governor of Alabama had deliberately appointed a segregated jury commission in exercising the discretion conferred upon him by statute. The argument, in short, went to the alleged racial discrimination in the appointment of the commission, not to the biases inherent in a commission composed entirely of white people, without regard to claimed discriminatory selection by the Governor.

For present purposes we may assume that the State may no more exclude Negroes from service on the jury commission because of their race than from the juries themselves. But the District Court found the appellants had shown only that for many years the jury commission had been composed entirely of white men, and concluded that without more the appellants' attack failed for want of proof. We think that ruling was correct. Quite apart from the problems that would be involved in a federal court's ordering the Governor of a State to exercise his discretion in a particular way, we cannot say on this record that the absence of Negroes from the Greene County jury commission amounted in itself to a prima facie showing of discriminatory exclusion. The testimony before the District Court indicated that the Governor had appointed no Negroes to the Greene County commission during the 12 years preceding the commencement of suit. But the appellants' trial counsel conceded that he could not prove his charge of discriminatory selection without the testimony of the Governor.[43] Whether or not such a concession was nec-

---

[43] The District Court granted a motion to quash the subpoena served on the Governor when it appeared that the appellants had failed to tender him his fees. See Fed. Rule Civ. Proc. 45 (c).

essary, the statement may well have led counsel for the appellees to conclude that they were not obliged to produce witnesses on the State's behalf with respect to this phase of the appellants' case.

Nor can we uphold the appellants' present contention that, apart from the question of discrimination in the composition of the jury commission, the absence of Negroes from the commission compelled the District Court to order the appointment of Negro commissioners. The appellants are no more entitled to proportional representation by race on the jury commission than on any particular grand or petit jury.[44]

## IV

There remains the question of the propriety of the relief afforded the appellants by the District Court. The court, as we have noted, enjoined the jury clerk and commissioners from systematically excluding Negroes from the Greene County jury roll, and directed them "to take prompt action to compile a jury list . . . in accordance with the laws of Alabama and . . . constitutional principles . . . ."[45] Pursuant to the court's order, the commission submitted a new jury roll, dated November 6, 1968. The clerk stated she had been into each of the precincts of Greene County and had contacted people of both races by personal visit, letter, or telephone; with their recommendations and with the help of the voting list and telephone directory, the commission compiled

[44] *Moore* v. *Henslee,* 276 F. 2d 876, 878–879; cf. *Swain* v. *Alabama, supra,* at 208; *Cassell* v. *Texas, supra,* at 291 (Frankfurter, J., concurring in judgment); *Akins* v. *Texas, supra,* at 403; *Martin* v. *Texas, supra,* at 320–321; *Gibson* v. *Mississippi, supra,* at 580; *Bush* v. *Kentucky, supra,* at 117; *Neal* v. *Delaware, supra,* at 394; *Virginia* v. *Rives, supra,* at 323; see *Hoyt* v. *Florida,* 368 U. S. 57, 59, 69.

[45] See 298 F. Supp., at 193.

a new jury roll. Whether this roll complies with the terms of the District Court's decree is a matter for that court to consider in the first instance. The court properly recognized that other and further relief might be appropriate. For that court "has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." [46]

Accordingly, the judgment below is affirmed, without prejudice to the right of the appellants to seek modification of the District Court's decree as circumstances may require.

*It is so ordered.*

---

[46] *Louisiana* v. *United States,* 380 U. S. 145, 154. Cf. *Alabama* v. *United States,* 304 F. 2d 583, 590–591, aff'd, 371 U. S. 37 (*per curiam*). Of particular relevance is the decree drawn by District Judge Johnson in *Mitchell* v. *Johnson,* in the District Court for the Middle District of Alabama, 250 F. Supp. 117, 123–124:

"The relief to be afforded in this case will involve not only the issuance of a prohibitory injunction, but an injunction requiring immediate affirmative action by the jury commissioners by their emptying the . . . County jury box, abandoning the present . . . jury roll without any further use of either, and by their compiling a jury roll and refilling the jury box in strict accordance with the law of Alabama and the constitutional principles herein set forth. . . . In remedying this wrong, the defendants are cautioned that if they apply Alabama's qualifications for jury service—particularly that qualification relating to good character and sound judgment and that qualification concerning the requirement that prospective jurors be able to read English—these qualification requirements must be imposed fairly and objectively and administered to all regardless of race, in a nondiscriminatory manner. . . .

"Failure on the part of the defendants to comply immediately and in good faith with the requirements of this opinion and order will necessitate the appointment by this Court of a master or panel of masters to recompile the jury roll and to empty and refill the . . . jury box." (Footnotes omitted.)

Accord: *Pullum* v. *Greene,* 396 F. 2d 251, 257; *Turner* v. *Spencer,* 261 F. Supp. 542, 544; *White* v. *Crook,* 251 F. Supp. 401, 409–410.

MR. JUSTICE BLACK, concurring.

I concur in the judgment and opinion of the Court except insofar as it may leave an implication that this Court has the power to vacate a state governor's appointment of jury commissioners or the power to compel the governor of a State to appoint Negroes or any other persons to the office of jury commissioner. In my judgment the Constitution no more grants this Court the power to compel a governor to appoint or reject a certain individual or a member of any particular group than it grants this Court the power to compel the voters of a State to elect or defeat a particular person or a member of a particular group.

MR. JUSTICE DOUGLAS, dissenting in part.

There comes a time when an organ or agency of state law has proved itself to have such a racist mission that it should not survive constitutional challenge. The instances are not numerous in our history. But they have appeared. One was present in *Louisiana* v. *United States,* 380 U. S. 145, where a state constitution required every voter who applied to register to "be able to understand" as well as "give a reasonable interpretation" of any section of the State or Federal Constitution "when read to him by the registrar." *Id.,* at 149. This interpretation test had had a history of depriving "otherwise qualified Negro citizens of their right to vote," *id.,* at 150, and was deemed incapable of fair application through policing by injunction. *Id.,* at 150 n. 9. We therefore struck it down.

The District Court in the instant case held that "[t]he attack on racial composition of the [jury] commission fails for want of proof. No proof was adduced except that the commission in Greene County now is and for many years has been composed entirely of white men appointed by the governor." 298 F. Supp. 181, 192.

But, as the opinion of the Court states, the record shows much more: it demonstrates a systematic exclusion of Negroes from juries in Greene County even though the Negroes outnumber the whites by two to one. It shows (1) that the white jury officials—consistent with southern racial patterns—had little, if any, contacts with Negroes; (2) that the officials knew very few Negroes and practically nothing about the black community; (3) that only a few Negroes were contacted to secure black names for jury listing; (4) that in applying the statutorily created subjective standards, the white jury officials relied, not only on their own subjective judgments, but also on the subjective judgments of other people; (5) that few Negroes could be expected to pass muster under these standards; and (6) that, as stated by the Court, "[i]n 1966 only 82 Negroes appeared among the 471 citizens listed on the jury roll; 50% of the white male population of the county found its way to the jury roll in that year, but only 4% of the Negro. In 1967, following a statutory amendment, the commission added women to the jury roll. Upon the expansion of the list, Negroes composed 388 of the 1,198 potential jurors— still only 32% of the total, even though the 1967 population of the county was estimated to be about 65% Negro." *Ante*, at 327–328.

I cannot see any solution to the present problem, unless the jury commission is by law required to be bi-racial. In the Kingdom of Heaven, an all-white or an all-black commission could be expected to do equal justice to all races in the selection of people "generally reputed to be honest and intelligent" and "esteemed in the community for their integrity, good character and sound judgment." Ala. Code, Tit. 30, § 21 (Supp. 1967). But, where there exists a pattern of discrimination, an all-white or all-black jury commission in these times probably means that the race in power retains authority to control the

community's official life, and that no jury will likely be selected that is a true cross-section of the community.

We have often said that no jury need represent proportionally a cross-section of the community.[1] See *Swain* v. *Alabama,* 380 U. S. 202, 208–209; *Cassell* v. *Texas,* 339 U. S. 282, 286–287. Jury selection is largely by chance; and no matter what the race of the defendant, he bears the risk that no racial component, presumably favorable to him, will appear on the jury that tries him. The law only requires that the panel not be purposely unrepresentative. See *Whitus* v. *Georgia,* 385 U. S. 545, 550. Those finally chosen may have no minority representation as a result of the operation of chance, challenges for cause, and peremptory challenges.

The problem in the present case is to keep the selective process free of any racist influence. That implicates the jury commission that has continuing oversight over the operation of the jury system.

I expressed my doubts in *Sellers* v. *Laird,* 395 U. S. 950, whether under the Selective Service System an all-white

---

[1] The Civil Rights Act of 1964, § 703, 78 Stat. 255, 42 U. S. C. § 2000e–2 (a), makes it unlawful for an employer on a federally financed project "to limit, segregate, or classify" his employees because of race. In commenting on the Philadelphia Plan, regulating employment on federally financed construction jobs, the Washington Post stated:

"Quotas are understandably abhorrent to those seeking to do away with discrimination. A quota in this context means a ceiling. Some years ago, when colleges were accused of discriminating against religious minorities in their admission policies, they fixed quotas in percentage terms for these minorities based upon their ratio to the general population and not upon their ability to meet competitive entrance tests; these quotas then became a maximum for the admission of minority group students. The goals embodied in the Philadelphia Plan constitute a floor, not a ceiling, a minimum rather than a maximum; they constitute an agreement to enlarge job opportunities for minority workers, not restrict them; and so they are in complete conformity with the essential spirit and purpose of the Civil Rights Act." Jan. 14, 1970, p. A18.

board could be expected to do equal justice to Negro registrants, at least as respects many problems. Those doubts are resolved here, because of the established pattern of racial discrimination which this all-white jury commission has credited to it. India has handled this type of problem by constitutional amendment.[2] But our

---

[2] The Constitution of India contains provisions for her economically and educationally deprived classes, including the untouchables. Article 15 (4) provides: "Nothing in this article or in clause (2) of Article 29 shall prevent the State from making any special provision for the advancement of any socially and educationally backward classes of citizens or for the Scheduled Castes and the Scheduled Tribes." This provision was added to the Constitution by a 1951 amendment, the object of which was to override the decision in *State of Madras* v. *Dorairajan,* All India Rptr. 1951 Sup. Ct. 226, and to make it constitutional for the State to *reserve* seats for backward classes of citizens and Scheduled Castes and Tribes in public educational institutions, or to take other similar action for their advancement.

Article 16 (4), relating to public employment, provides: "Nothing in this article shall prevent the State from making any provision for the reservation of appointments or posts in favour of any backward class of citizens which, in the opinion of the State, is not adequately represented in the services under the State." The objective of "adequate representation" applies not merely to lower government positions, but to all levels of government office. See *General Manager, S. R. Co.* v. *Rangachari,* All India Rptr. 1962 Sup. Ct. 36.

Articles 330 and 332 provide for the reservation of seats for Scheduled Castes and Scheduled Tribes, except for the Scheduled Tribes in the tribal areas of Assam, in the House of the People and the legislative assembly of every State. Article 331 provides for the nomination of not more than two members of the Anglo-Indian community if the President is of the opinion that the community is not adequately represented in the House of the People. The reservation of seats mentioned above and the nomination of members of the Anglo-Indian community is to cease after 20 years, viz., January 1970. A constitutional amendment extending that time is now before the national parliament and the legislatures of the several States. See Indian & Foreign Review, Jan. 1, 1970, p. 7.

constitutional mandate against racial discrimination is sufficient without more.

Where the challenged state agency, dealing with the rights and liberties of the citizen, has a record of racial discrimination, the corrective remedy is proportional representation. Under our Constitution that would indeed seem to be the only effective control over the type of racial discrimination long practiced in this case.

I would not write a decree that requires a governor to name two Negroes out of three commissioners. I would go no further than to strike down this jury commission system, because it does not provide for proportional representation of the two races.