Peggy JAMES et al., Plaintiffs,

v.

George C. WALLACE, Defendant.

Civ. A. No. 74-83-N.

United States District Court,
M. D. Alabama, N. D.

Dec. 12, 1974.

## OPINION

VARNER, District Judge.

This cause is submitted on the pleadings, depositions, interrogatories and answers, and stipulation of facts filed in said cause.

The complaint charges that the Defendant, Governor George C. Wallace of the State of Alabama, has discriminated against Negroes in appointments to Boards and Commissions set up under Alabama law and prays for a declaratory judgment that the said Defendant Governor excludes blacks from service on the various Boards, Commissions, etc., because of their race and in violation of the Plaintiffs' Fourteenth Amendment rights and that a mandatory injunction issue to the said Defendant to cease and desist from refusing to appoint blacks to the various Boards, Commissions, etc., solely because of their race. The defense raises several issues placing clearly with the Court for decision questions of official immunity, the extent of federal authority to interfere with State officials' discretionary appointments, and the general denial that the Defendant has systematically excluded blacks from the said Commissions and Boards because of their race.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

While statistics may often be very enlightening, the arguments of the attorneys in this case amply demonstrate the confusing aspects thereof. The Plaintiffs contend that, while the Defendant Governor says he appointed 144 blacks out of 1,556 appointments, 65 of these blacks were appointed by other State employees (apparently at the designation of the Governor) and that appointments to those Boards administering federal funds add to the above 1,556 appointments another 1,142 appointments, making a total of 2,698 appointments. It appears that the picture is somewhat clouded by the fact that some of the appointees, for instance, those to the Selective Service Boards, are made by per-

sons other than the Governor (in case of Selective Service, the President of the United States) at the recommendation of the Governor and that the appointor actually usually follows all of the Governor's recommendations thereon. The picture is further clouded by the fact that the Governor, himself, makes many of the appointments at the recommendation of other persons and that he, in fact, usually does not even know the persons that he is appointing but relies upon various authorities in the counties wherein the appointees are to serve. Plaintiffs insist that actually only about three percent of all appointments made by Governor Wallace, or 71 out of 2,148, were black. Plaintiffs further insist that a number of Boards within the State of Alabama have no black appointees serving thereon and point out that there have been black persons admitted by the Governor to be qualified who have been available for appointment but who have not been appointed. The Plaintiffs do not go into the question of whether or not there have also been white candidates for appointments who have been qualified but have not been appointed. This Court is impressed that the comparative number of black to white appointments by Governor Wallace to the various State Boards and Commissions does not compare favorably to the ratio of the total number of blacks in the State of Alabama to the total population of Alabama. The evidence shows that blacks constitute about 23 percent of the population of the State of Alabama.

The evidence was clear that the Governor did not actually know most of the people or the race of most of the people whom he appointed on the various County Boards and that he usually relies on recommendations therefor of his staff and of county officials. He admits, however, that he might have assumed, had he considered such, that most of those who would likely be recommended by these persons would be white. The Defendant submitted affidavits of his four past executive secretaries, who were primarily responsible for accumulating and submitting to the Governor the names and qualifications of persons available for such appointments, which purport to show that men responsible for aiding the Governor in making appointments did not use race as a basis for the appointments. The present executive secretary signed an affidavit that the Defendant Governor asked him to seek more ethnic groups to serve on Boards, but this affidavit is of little aid in this suit since it does not appear whether this request was made before or after suit was brought.

Plaintiffs insist that Governor Wallace has, by his background in anti-integration actions and statements through his political life, indicated his bad faith. However, he has, without question, changed the nature of his public utterances thereunto pertaining and has received considerable ballot-box support from blacks. These facts, together with the fact that he has appointed and recommended for appointment by others a number of blacks to various public Boards, evidence a strong change of attitude by the Governor toward the rights of blacks.

In the mind of this Court, there may be considerable differences between the discretionary power of a Governor to appoint members of a Board reflecting the policy-making power of the Governor to effect the political program or platform upon which he was elected and his discretionary power to appoint members of a Board the duties of which are clerical or otherwise not reflective of the overall policy programs of the Governor himself. A Governor, being necessarily a political animal, must necessarily retain loyalties of the Board members, in whom is vested the policy-making powers which may conflict with the Governor's overall program. Judicial interference with this statutory discretion to select these policy makers might be a serious infringement upon the duties of the Executive Branch. The severity of "the problems that would be involved in a federal court's ordering the Governor of

a State to exercise his discretion in a particular way," Carter v. Jury Commission of Greene County, 396 U.S. 320, 338, 90 S.Ct. 518, 528, 24 L.Ed.2d 549; Mayor of Philadelphia v. Educational Equality League, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974), would be greatly magnified among the appointments to policy-making Boards.[1] However, the parties have not made this distinction, and this Court will not depart from the issues made by the parties. The pleadings sweep with a wide broom, including in its path every Board or Commission appointment which is vested in the pure untarnished discretion of the Governor.

■ The questions associated with immunity are fully answered by the recent opinion of the Supreme Court in Scheuer v. Rhodes, supra, and by the Fifth Circuit Court of Appeals in United States v. McLeod, 385 F.2d 734 (5 CA 1967). In *Scheuer* the Court states the following:

"The Eleventh Amendment to the Constitution of the United States provides: 'The Judicial power of the United States shall not be construed to extend to any suit in law and equity, commenced or prosecuted against one of the United States by citizens of another State * * *.' It is well-established that the Amendment bars suits not only against the State when it is the named party but when it is the party in fact. * * * Its applicability 'is to be determined not by the mere names of titular parties but by the essential nature and effect of the proceeding, as it appears from the entire record.' Ex parte New York, 256 U.S. 490, 500, [41 S.Ct. 588, 590, 65 L.Ed. 1057] (1921).

"However, since Ex parte Young, 209 U.S. 123, [28 S.Ct. 441, 52 L.Ed. 714] (1907), it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law. Ex parte Young teaches that when a state officer acts under a state law in a manner violative of the Federal Constitution, he

'comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected *in his person* to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States.' 209 U.S. at 159–160, [28 S.Ct. 441, at 454].

" * * * While it is clear that the doctrine of Ex parte Young is of no aid to a plaintiff seeking damages from the public treasury, (citations omitted), damages against individual defendants are a permissible remedy in some circumstances notwithstanding the fact that they hold public office. Myers v. Anderson, 238 U.S. 368, [35 S.Ct. 932, 59 L.Ed. 1349] (1915). See generally Monroe v. Pape, 365 U.S. 167, [81 S.Ct. 473, 5 L.Ed.2d 492] (1961); Moor v. County of Alameda, 411 U.S. 693, [93 S.Ct. 1785, 36 L.Ed.2d 596]." Scheuer v. Rhodes, supra, 94 S.Ct. at 1686, 40 L.Ed.2d at 97.

As pointed out in United States v. McLeod, supra, immunity does not extend to injunctive relief:

"In Pierson v. Ray (1967), 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288, the Supreme Court held that judges are immune from liability for *damages* in suits under 42 U.S.C. § 1983. The case does not, of course, mean that they may not be enjoined from pursu-

[1]. As stated in Scheuer v. Rhodes, Governor of Ohio, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974): " * * * since the options which a chief executive and his principal subordinates must consider are far broader and far more subtle than those made by officials with less responsibility, the range of discretion must be comparably broad." There must also be some variation in broadness of discretion depending upon the duties of the executive to be appointed.

ing a course of unlawful conduct."
385 F.2d at 738, n. 3.

This Court, therefore, concludes that the defense of official immunity is not available to the Defendant in this case.

While the Court decided *Mayor of Philadelphia* on the failure of the plaintiffs to prove discrimination, it paid particular attention to problems of a court's attempting to exert control over an elected executive's discretionary appointive power under separation of powers principles, as follows:

"The Mayor's principal contention is that judicial review of the discretionary appointments of an executive officer contravenes basic separation-of-powers principles. The Mayor cites cases concerning discretionary appointments in the Federal Executive Branch, such as Marbury v. Madison, 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803) and Myers v. United States, 272 U.S. 52, [47 S.Ct. 21, 71 L.Ed. 160] (1926). * * *

"(T)he Mayor's reliance on federal separation-of-powers precedents is in part misplaced, because this case, unlike those authorities, has nothing to do with the tripartite arrangement of the Federal Constitution. But, to the degree that the principles cited by the Mayor reflect concern that judicial oversight of discretionary appointments may interfere with the ability of an elected official to respond to the mandate of his constituency, they are in point. There are also delicate issues of federal-state relationships underlying this case. The federalism questions are made particularly complex by the interplay of the Equal Protection Clause of the Fourteenth Amendment, with its special regard for the status of the rights of minority groups and for the role of the Federal Government in protecting those rights. * * *

"Were we to conclude that respondents had established racial discrimination in the selection process for the Panel, we would be compelled to ad-dress the 'problems' noted in *Carter*, supra, and raised by the Mayor. We need not go so far, however, because we find that this case founders on an absence of proof, even under the approach taken by the Court of Appeals." (94 S.Ct. at p. 1329, 39 L.Ed. 2d at pp. 640–642)

In referring to the problems involved in "oversight of discretionary appointment", the Court cited Carter v. Jury Commission of Greene County, supra, and pointed out in footnote 14 the following:

"In a concurring opinion in *Carter*, Mr. Justice Black revealed that for him these 'problems', as the Court put it, were conclusive. 'In my judgment the Constitution no more grants this Court the power to compel a governor to appoint or reject a certain individual or a member of any particular group than it grants this Court the power to compel the voters of a State to elect or defeat a particular person or a member of a particular group.' 396 U.S., at 341, [90 S.Ct. 518, at 529]. Mr. Justice Black's views have not, however, been adopted by the Court."

Apparently, the "problems" referred to in *Carter* evolve from a weighing of the Equal Protection Clause of the Fourteenth Amendment with the reservation of State's rights protected by the Tenth Amendment when considered in the light of the obvious fact that an elected official must "respond to the mandate of his constituency" and that appointments made by higher State officials, being reviewable at the ballot box, are not subject to review by the courts. A Governor is elected to effectuate a program, and he has responsibility therefor. In selecting his administrative officers, he must be allowed a free discretion so that he may select executives who will aid in effectuating that program, as he is accountable at the ballot box for his failures. This is the essence of the democratic process. As pointed out in *Mayor*, supra, the separa-

tion-of-powers doctrine expressed in the Federal Constitution does not apply on the State level and is not a controlling question here, but the question of the weight of the equal protection infringement, if any, must be decided in the light of federal-state relationships.

Examining the clauses of the Constitution in consideration, we look, first, to the pertinent portion of the Fourteenth Amendment: "No state shall * * * deny to any person within its jurisdiction the equal protection of the laws." If the Governor of the State of Alabama in exercising his discretionary powers of appointment systematically fails to consider appointing blacks to the various public Boards serving the State of Alabama by appointment of the Governor, this Court is of the opinion that the State, through its chief elected official, the Governor, is denying blacks the equal protection of the laws, that is, an equal opportunity to serve on the various administrative and executive Boards through and by which the State of Alabama and its citizens are governed and its laws are administered. While a federal court has no authority to control the discretion of any State official and while the Supreme Court in *Mayor* recognized that appointment of Boards such as those involved in this matter are discretionary appointments, this does not mean that a State or a Federal official may so conduct his official business in ways which violate the constitutional rights of others. It must be remembered that selection by a chief executive of a public servant should be governed to some extent by consideration of many qualifications of the appointee, including but not limited to the following: industry, integrity, intelligence, likely devotion to the particular job to be accomplished, likely belief in the particular method proposed for accomplishing the job, education or experience likely to qualify the appointee for the job, loyalty to the person or program of the chief executive, likelihood of personality or policy conflicts with others in the program, desire to be of public service, and personality traits likely to aid or interfere with performance of the job. These characteristics are not considered in the statistical analysis relied on by the Plaintiffs to prove their case. In considering a comparable statistical analysis in Mayor of Philadelphia v. Educational Equality League, supra, the Supreme Court, in reversing the Court of Appeals, stated the following:

"Statistical analyses have served and will continue to serve an important role as one indirect indicator of racial discrimination in access to service on governmental bodies, particularly where, as in the case of jury service, the duty to serve falls equally on all citizens (citations omitted). But the simplistic percentage comparisons undertaken by the Court of Appeals lack real meaning in the context of this case. * * *

"In sum, the Court of Appeals' finding of racial discrimination rests on ambiguous testimony as to an alleged statement in 1969 by then Mayor Tate with regard to the 1969 School Board, not the 1971 Panel; the unawareness of certain organizations on the part of a city official who did not have final authority over or responsibility for the challenged appointments; and racial-composition percentage comparisons that we think were correctly rejected by the District Court as meaningless. In our view, this type of proof is too fragmentary and speculative to support a serious charge in a judicial proceeding." (94 S.Ct. at p. 1333, 39 L.Ed.2d at pp. 644–645.)

While statistical analyses encompassing all personal attributes are impossible to obtain, the analysis offered by the Plaintiffs falls far short of the proof required to demonstrate abuse of a statutory discretion.

As was stated in United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368, and quoted in Monroe v. Pape, supra: "Misuse of power, possessed by virtue of state law and made possible only because the wrong-

doer is clothed with the authority of state law, is action taken 'under color of' state law." In Carter v. Jury Commission of Greene County, supra, the Supreme Court found an absence of proof of discrimination in selection of jurors.

That Court found on the question of standing that defendants in criminal proceedings do not have the only cognizable legal interest in nondiscriminatory jury selection: "People excluded from juries because of their race are as much aggrieved as those indicted and tried * * * (citations omitted; at p. 329, 90 S.Ct. at p. 523)."

The Carter Court further found that, even though "(f)or present purposes we may assume that the State may no more exclude Negroes from service on the jury commission because of their race than from the juries themselves" (at 338, 90 S.Ct. at 528), the plaintiffs failed to establish a systematic exclusion of Negroes from service on the jury commission even though they showed that for many years the jury commission had been composed entirely of white men. The Court held:

> "Quite apart from the problems that would be involved in a federal court's ordering the Governor of a State to exercise his discretion in a particular way, we cannot say on this record that the absence of Negroes from the Greene County jury commission amounted in itself to a prima facie showing of discriminatory exclusion." (at p. 338, 90 S.Ct. at 528)

The Court also held that the absence of Negroes from the commission was insufficient grounds to order the Governor to appoint Negro commissioners, saying:

> "The appellants are no more entitled to proportional representation by race

on the jury commission than on any particular grand or petit jury." (at p. 339, 90 S.Ct. at p. 528)

The statistical analysis relied upon in Carter was that no black had been appointed on the jury commission and that from 1961 to 1963, when approximately three-fourths of the county's population were Negro, the largest number of Negroes ever to appear on the jury list was about seven percent, that after a single-judge Federal District Court entered a declaratory judgment instructing the commission not to pursue a course of conduct discriminating against Negroes, about 20 percent of the jurors were Negroes, and in 1967, following a statutory amendment adding women to the jury poll, about 32 percent of the total jurors were Negroes, whereas about 65 percent of the total population of the County were Negroes. The District Court found, and the Supreme Court affirmed, that there was no invalid exclusion of Negroes on a racially-discriminatory basis. Apparently, there was no statistical analysis based on the percentage of blacks or whites who met the other statutory requirements for jury eligibility, including honesty, intelligence, esteem in the community, good character and sound judgment. Admittedly, statistics on this basis are somewhat hard to come by.

The instant case appears to be such a case that the Court should beware of the evils of federal intrusion on State powers absent a clear showing of violation of the rights to equal protection of the Plaintiffs. In the opinion of this Court, therefore, the Plaintiffs should be denied relief.