412

# CIRCUIT COURT OF AUGUSTA COUNTY

Commonwealth of Virginia

v.

Douglas Christian Broce

June 6, 2016

Case Nos. CR16000014-00 (00-01) and CR16000024-00

BY JUDGE VICTOR V. LUDWIG

On May 26, 2016, the defendant, Douglas C. Broce, filed a Motion To Unseal Juror Questionnaires (the Motion), asking that the Court issue an order requiring the Clerk of this Court to "disclose the juror questionnaires and the responses to those questionnaires of the 2016 juror list."[1] Broce's concern is that some felons might have been excluded from service on his jury pool. In light of the fact that these cases are scheduled for a jury trial on June 10, 2016 (but seven working days from the first day on which I can deliver this decision), I thought it best to respond as soon as I could. I deny the Motion.

The basis for the Motion is the executive order (the Order) issued by the Honorable Terence R. McAuliffe, Governor of the Commonwealth of Virginia, on April 22, 2016. Order for the Restoration of Rights (April 22, 2016). Time does not permit me fully to address the issue of the constitutionality of the Order, although, given the sweeping language of Article V, Section 12, of the Constitution of Virginia, I do not see much limitation on the Governor's power. Nevertheless, I have some doubt. However, given the constraints of time, I will leave to the General Assembly a more thorough examination of that issue in the case currently pending in

---

[1] From all appearances, the Motion is nearly identical to one filed in the Dinwiddie Circuit Court. Motion for Defendant, *Commonwealth v. Brown*, Case Nos. CR13000230-00 *et seq.*, (Dinwiddie Cnty. May 9, 2016).

the Supreme Court of Virginia. *Howell v. McAuliffe,* Record No. 160784 (Va. filed May 23, 2016).

For the purposes of the case before me, I will assume that the Governor is acting within his constitutional authority. Still, the Order is not as clear as one might hope; so, considerations of constitutionality aside, its effect, application, and implementation are questionable. For example, it is difficult to discern to whom the Order applies or when it applies. It is limited to those who, as of its effective date, have "completed their sentences of incarceration" and "completed their sentences of supervised release, including probation and parole." A Court may sentence a defendant to a term certain (*e.g.,* 10 years), suspend a portion of that term (*e.g.,* 7 years) for a specified period after release from incarceration (*e.g.,* 15 years), and put the person on supervised probation for a shorter time (*e.g.,* 5 years after her release from incarceration). At what point does the Order operate as to that felon? She may never complete her "term of incarceration" (10 years). After she serves the active time of 3 years, it will be another 5 years before she will have completed her term of supervised release (after which she is not at risk of violating the terms of her supervised probation). But even then, the period of her suspended time will extend for another 7 years before she is free of the risk of serving the balance of her sentence if she violates the laws of the Commonwealth. For some crimes, whatever the actual sentence is, if any portion of it is suspended, it is suspended for a period equal to the maximum sentence that could have been imposed. Would the Order ever apply to that felon? Although it is unnecessary for the disposition of the case before this Court, in a proper case, another Court might find the Order too ambiguous to be enforced.

Although he purports to act under the broad "authority vested in [the Governor] under Article V, Section 12, of the Constitution of Virginia," what the Governor has done is ordered "the removal of the political disabilities consequent upon conviction of a felony *imposed by Article II, Section 1, of the Constitution of Virginia*" [emphasis added] on certain felons. With no further expansion of the scope of the removal of political disabilities, the Governor has also purportedly "restored [to them] . . . (3) the right to serve on a jury. . . ."

It is, at best, an ambiguous pronouncement. The Governor conflates his power to restore civil rights with his authority to remove political disabilities, apparently assuming that they are the same thing. That conflation is further apparent in the fifth "whereas" paragraph of the Order: "[T]he Governor is empowered by Article V, Section 12, of the Constitution of Virginia 'to remove political disabilities consequent upon conviction,' thus to restore the political rights of any persons disqualified by Article II, Section 1." He equates removing political disabilities with restoring civil rights, but, of course, that assumes that the imposition of a political disability necessarily impinges on a civil right and that the restoration of a civil right necessarily

removes a political disability. In the Order, the Governor removed the disabilities (using the plural) "imposed by Article II, Section 1, of the Virginia Constitution," but that section of the Constitution addresses only the (singular) right to vote, and the language of the section does not impose a disability; it restricts a right. If the only political disabilities removed by the Order are those "imposed by Article II, Section 1," one must inquire how that limited cure restores "the right to hold public office," "the right to serve on a jury," or "the right to act as a notary public," none of which is impacted (much less removed) by Article II, Section 1, and not all of which can properly be characterized as "rights."

The point of the inquiry is sharpened by the fact that, in the Governor's Summary of the Order (unsigned, but issued on the Governor's stationery), the entire thrust of the statement runs solely to the restoration of felons' right to vote. Summary of the Governor's Restoration of Rights Order (April 22, 2016). Nowhere is there a reference to any of the other three "rights" or any explanation how his removing political disabilities "imposed by Article II, Section 1," even affects the felon's eligibility for jury service. The Summary refers to felons' being prohibited from voting. It speaks to "disenfranchisement laws," "poll taxes and literacy tests," to the consolidation of political power for whites. It refers to felons' being "unable to vote" and to "this law [which] continues to disenfranchise racial minorities and other citizens who have paid their debt to society and are otherwise qualified to vote."

Curiously (well, given the general lack of precision of the Summary, maybe not), it does not inform the reader to what law "this law" refers. To the extent it is referring to the Constitutional provision in Article II, Section 1 ("No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor"), the reference to "this law" does not seem to recognize that it is more than a mere statutory enactment; it is, after all, a provision of the Constitution of the Commonwealth of Virginia, proposed to and adopted by the people of the Commonwealth. However the Governor chooses to equate an act of the General Assembly with a provision in the fundamental contract that is the supreme law of the Commonwealth, he must recognize that the latter is not amendable by the General Assembly without the approval of the citizens, and it certainly is not to be unilaterally amended by the Executive Branch, however imperial it might fancy itself to be (no doubt following the example of the Executive Branch of another sovereign). In any event, the fact is that "this law" refers only to the right to vote, and that limited focus emphasizes the objective to be achieved by the Order.

The Summary refers to the Governor's constitutional authority to restore "civil rights to a large number of Virginians currently disenfranchised for a felony conviction." It represents that, as a result of the Governor's action, "as many as 206,000 individuals will be qualified to vote in Virginia."

Nowhere does the Summary explain, in any way, how the Governor's acting to remove political disabilities "imposed by Article II, Section 1," supports his assertion that he is acting to remove political disabilities beyond the scope of that provision, which speaks only to the right to vote. He purports to give a specific basis for his action, and then he acts in a way far more expansive than his justification can support.

Broce appears to assume that the Order immediately removes any impediment to a felon's serving on a jury, presumably because it either restores a civil right[1] or removes a political disability. Article V, Section 12, refers to the Governor's authority to "remove political disabilities." It is not clear that the terms, "civil rights" and "political disabilities" are synonymous; indeed, a well-established principle of statutory construction is that, when the General Assembly uses certain language in one part of the legislation and different language in another part, it intends different meanings. *See Simon v. Forer*, 265 Va. 483, 490 (2003). It is no stretch to extend that principle to the citizens of the Commonwealth when they adopt the basic compact of government. Couple that with the fact that the Constitution authorizes the Governor to "restore" civil rights (clearly reestablishing something that was lost) and to "remove" political disabilities (merely removing an impediment to something that was never lost but only prohibited), and it is nearly a necessary conclusion that the two are not the same thing. "In construing constitutional provisions, the Court is 'not permitted to speculate on what the framers of [a] section might have meant to say, but are, of necessity, controlled by what they did say.' *Harrison v. Day*, 200 Va. 439, 448, 106 S.E.2d 636, 644 (1959). If there are 'no doubtful or ambiguous words or terms used, we are limited to the language of the section itself and are not at liberty to search for meaning, intent, or purpose beyond the instrument.' *Id.*" *Blount v. Clarke*, Record No. 151017, 2016 Va. LEXIS 15, at *6 (Feb. 12, 2016). Moreover, the power to remove political disabilities is not coextensive with the power to restore rights. *See, e.g., Gallagher v. Commonwealth*, 284 Va. 444, 452 (2012) ("We construe the term 'power to . . . remove political disabilities,' contained in Article V, Section 12, of the Constitution, not to include the power to restore firearm rights."). The right to bear arms is, of course, a right, not merely a political disability, protected by both the Constitution of Virginia and the federal constitution.

The right to vote is clearly a civil right; it is specifically recognized by the Constitution of the Commonwealth in Article II. What is not clear, however, is whether service on a jury is a civil right; it is not found to be a protected right either in the Constitution or in the Code. Indeed, I find no binding, precedential authority which recognizes any constitutionally protected right to serve on a jury. But, if a state, like the Commonwealth,

---

[1] Article II, Section 1, specifically refers to a power by the Governor to restore "civil rights" to a felon, which then allows him to vote.

elects to incorporate juries into its criminal justice system, it must guarantee the constitutional rights of potential jurors.

> Whether jury service be deemed a right, a privilege, or a duty, the State may no more extend it to some of its citizens and deny it to others on racial grounds than it may invidiously discriminate in the offering and withholding of the elective franchise. Once the State chooses to provide grand and petit juries, whether or not constitutionally required to do so, it must hew to federal constitutional criteria in ensuring that the selection of membership is free of racial bias.

*Carter v. Jury Comm'n,* 396 U.S. 320, 330 (1970); *see also Batson v. Kentucky,* 476 U.S. 79 (1989). *Batson* addressed a defendant's right, under the Equal Protection Clause, to an impartial jury not tainted by discrimination during the selection process; it did not establish, or even address, the right of a citizen to serve on the jury. The holding most specifically does not characterize service on a jury to be a right, constitutional or otherwise. Rather, *Carter* addresses the rights of those who reside in jurisdictions where jury membership is a possibility. It is not the right to serve, in the abstract, that is at issue in the case; rather, what the federal Constitution requires is the assurance that, once a state has established a system that affords any citizen the opportunity to serve on a jury, it must operate that system in such a way as to afford constitutional protections to all who might serve. I am reasonably confident that the constitutional mandate of *Carter* applies to other protected classes. Moreover, whatever might be revealed by exhaustive research, I am certain that felons are not in such a protected class, entitled to strict or heightened scrutiny or to protection on any other categorical basis.

I acknowledge that the Fourth Circuit, in *United States v. Metzger,* 3 F.3d 756 (4th Cir. 1990), held, when applying U.S.C. § 922(g)(1), that "[t]he term 'civil rights' denotes 'those rights accorded to an individual by virtue of his citizenship in a particular state,' comprising the rights to vote, to hold public office, and to serve on a jury." *Id.* at 758. There are numerous other federal cases that cavalierly refer to jury service as a right, but none cites any authority for the proposition. Moreover, none makes any reference to the observation of the United States Supreme Court in *Carter,* although the Supreme Court, in *Powers v. Ohio,* 499 U.S. 400, 408 (1990), quoted the same language cited above. Whatever the lower federal courts say on the issue of service on a jury being a right, they do not have the support of the United States Supreme Court.

I would be remiss if I did not note the case of *Prichard v. Battle,* 178 Va. 455 (1941), in which the Virginia Supreme Court referred to the conclusion of a foreign jurisdiction that service on a jury is a civil right. However, the status of jury service (a) was not the issue before the Court, and (b)

the Court used the Florida Court's holding only to support its conclusion that a gubernatorial pardon did not also authorize the defendant to obtain collateral civil relief.

Not only has service on a jury not been protected as a right, but one may question whether denial of jury service has been recognized as a "political disability." There is one case in which the Supreme Court of Virginia has referred to jury service in a discussion of a Governor's removing political disabilities, but the issue before the Court was collateral to the question of whether the felon's loss of his right to serve on a jury was a political disability. The Court simply acknowledged that the Governor had issued an order removing political disabilities, which order included serving on a jury. *Gallagher v. Commonwealth,* 284 Va. 444 (2012). There is no case in the Commonwealth in which a prohibition against one's serving on a jury has been held to be a political disability.

The basis for a felon's being ineligible to serve on a jury is Va. Code Ann. § 8.01-338, which disqualifies "[p]ersons convicted of treason or a felony. . . ." Clearly, that is a legal disability, one statutorily created, and Va. Code Ann. § 8.01-352 provides a procedure for a party to object to "any juror on account of any legal disability." In addition, the Court of Appeals in *Mighty v. Commonwealth,* 17 Va. App. 495 (1993), relying on *Puryear v. Commonwealth,* 83 Va. 51 (1887), opined that "[t]he Supreme Court of Virginia has expressly recognized that a prospective juror who has a felony conviction is a person with a 'legal disability'." *Mighty,* 17 Va. App. at 498. Despite the opportunity to do so, the Court did not refer to that person as one suffering from a "political disability."

Setting aside those fundamental issues, I will turn to Broce's arguments (a) as though the Order means what it says (however unartfully it says it) and (b) as though the Order actually does restore to felons the right (if a right it is) to serve on a jury or that it removes the political disability (if a political disability it is) of not being eligible to serve on a jury.

In ¶ 2 of his Motion, Broce notes that the jury panel is selected from a list of potential jurors provided to the Augusta County jury commissioners by the Supreme Court (the Supreme Court List) which "includes individuals culled from a Voter Registration list." Va. Code Ann. § 8.01-345 requires that the "commissioners shall, not later than December 1 following their appointment, submit a list showing the names, addresses, freeholder status, and, if available, the occupations of such of the inhabitants of their respective counties or cities as are well qualified under § 8.01-337 to serve as jurors and are not excluded or exempt by §§ 8.01-338 to 8.01-341 and 8.01-342. Such master jury list shall be used in selecting jurors for a twelve-month period beginning on the first day of the first term of court in the calendar year next succeeding December 1." For the purposes of this opinion, the Court accepts that the Supreme Court provides the initial list and that it is derived from the current voter registration list.

Broce asserts that, "in the past, individuals were also culled from a Department of Motor Vehicles list (the DMV list), however that practice was stopped roughly ten years ago because it resulted in a large number of unqualified individuals, such as convicted felons." From those assertions, the reasonable inference is that the list submitted by the Supreme Court which resulted in the generation of jury questionnaires for consideration by the jury commissioners was derived from the voter registration list, not the from the DMV list.

In ¶ 4 of his Motion, Broce alleges that "he has reason to believe that convicted felons were excluded from the eligible 2016 juror list in the fall of 2015 by jury commissioners," and he very specifically wants to review the questionnaires currently in the Clerk's possession. In ¶ 5 of his Motion, Broce asserts that, "[i]n order to sufficiently investigate whether convicted felons have previously been excluded from the eligible pool of possible jurors, [he] must have access to the juror questionnaires and the responses. . . ." However, although he alleges a "reason to believe that convicted felons were excluded . . . by jury commissioners," he offers not a single fact as a basis for that belief, and his pleading supports the contrary probability.

Until he has his "civil rights . . . restored," a felon cannot vote. Va. Const., art. II, § 1. A reasonable assumption is that the Supreme Court List, used to elicit jury questionnaires for the year 2016, did not include felons because it was derived from the Voter Registration list. Hence, it is unlikely that felons submitted jury questionnaires in response to the Supreme Court's request because they would not have been sent a request to do so. Given the likelihood that no felons submitted questionnaires for consideration by the Augusta County juror commissioners, it is equally unlikely that the commissioners would have deemed any felons to be ineligible for service, because they would have no questionnaires from felons to reject. It is clear, then, that reviewing the questionnaires to find rejections of those who were ineligible to have sent questionnaires would be unlikely to be productive.

In ¶ 5 of his Motion, Broce asserts that, in *Eccles v. Commonwealth,* 212 Va. 679 (1972), the Court held that "good cause is shown for disclosure of the jury list where disclosure is 'for the purpose of determining whether the jury selection procedures required by law and by the Constitution of the United States and the Constitution of Virginia [are] complied with'." The Court held no such thing.

First, the Court made no decision whatsoever on the matter, much less a decision on the merits. The Commonwealth conceded that the trial court erred and consented to a reversal and a remand. Based on that concession and consent, the Supreme Court entered its order. Worse than that, however, Broce asserts that the holding (or non-holding) was based on "good cause," a term that appears nowhere in the opinion. The Court never considered "good cause" because it was unnecessary; the Commonwealth conceded the trial court's error.

Second, Broce asserts that Court-approved access to the master list is necessary "for the purpose of determining whether the jury selection procedures required by law and by the Constitution of the United States and the Constitution of Virginia [are] complied with." The verb "are" appears in Broce's Motion in brackets, just as I have indicated, and that is simply a misstatement of the language in *Eccles*. In that case, the Court focused on whether, in preparing the master list, the procedures "required by law and by the Constitution of the United States and the Constitution of Virginia were complied with." The Court was considering whether the preparation of the master list was in compliance with statutory and constitutional law when it was prepared, not whether the preparation of that list, months prior to the challenge, was in compliance with some purported change in law after its preparation.

In defense of Broce, in *Prieto v. Commonwealth*, 283 Va. 149, 185 (2012), the Supreme Court of Virginia also used the present tense in brackets. However, that was, at best, an unnecessary alteration by the Court in *Prieto*. The Court's decision went on to say that the issue was whether the jury lists (and the lists for three years were under consideration) "could have shown that any constitutionally significant under-representation of a distinctive group . . . was due to systematic exclusion, rather than by chance." *Id.* The Court was considering statutory and constitutional compliance of the preparation of the lists as they were constituted when they were prepared, not as they might have been constituted on an ever-changing basis as additional citizens became eligible during the year following the preparation of the lists.

In ¶ 6 of his Motion, Broce asserts that, because of the Order, "now eligible jurors were undoubtedly excluded during the eligibility process conducted by the jury commissioners during their review of jury questionnaires." As I have noted previously, that is extremely unlikely. Nevertheless, even given the possibility, it is of no consequence. The potential jurors to whom Broce refers may be "now eligible," but they were not "then eligible" when the jury questionnaires were distributed. The jurors for the period covered are to be selected from the questionnaires which result from the Supreme Court List, and there is no provision for the list to be expanded to include those who, over the year period following the preparation of the Supreme Court List, become eligible. For example:

1. Some people may have been residents of the Commonwealth for a year when the list was prepared, but they had not been residents of Augusta County for a period of six months, although they did become residents of Augusta County for the requisite period at some point during the year. Nevertheless, they are not on the list, and they cannot serve.

2. Some people may have been under the age of 18 years at the time when the list was prepared, although they attained that age at some point during the year. Nevertheless, they are not on the list, and they cannot serve.

3. Some people may have been determined to be mentally incompetent at the time when the list was prepared, although they were restored to competency at some time during the year. Nevertheless, they are not on the list, and they cannot serve.

4. Even prior to the Governor's Order, some people were convicted felons at the time the list was prepared, although, through the application process then in effect, the Governor removed their political disabilities. Nevertheless, they are not on the list, and they cannot serve.

All of the people whom I have described may be eligible to be on the list when it is next prepared, but the Order could not (and did not purport to) require a redetermination, mid-year, month by month, week by week, day by day, perhaps hour by hour, of those eligible to be on the list and a consequent revision of that list. Moreover, the Governor's Order did not and could not repeal, and did not and could not supplant, the General Assembly's scheme for the annual preparation of the Supreme Court List, or for its mailing questionnaires, or for delivering those questionnaires to the Augusta County jury commissioners.

Had that been the Governor's intention, he has not been helpful in describing how to accomplish his goal (or the goal that Broce apparently seeks). There currently exists no statutory mechanism for adding names to the list on a revolving basis as additional persons become eligible. There is no statutory mechanism for having newly eligible individuals prepare and submit questionnaires to the Supreme Court for the current year's jury list. There is no statutory mechanism for the Supreme Court to send those questionnaires to the jury commissioners of Augusta County for their consideration. Such a system would be unworkable, is not constitutionally mandated, and the Governor cannot, by the stroke of his pen, even if operating within his constitutional authority, create an entirely new body of law for jury selection.

In ¶ 6 of his Motion, Broce indicates that he wants to assert a constitutional challenge to the "Augusta County juror selection process" and that he cannot do that without "disclosure of the requested juror information." First, as I have indicated, access to the questionnaires is unlikely to disclose any rejections of felons by the commissioners because of the improbability that any felons submitted questionnaires, because they probably never received any.

Second, Broce relies on eight constitutional provisions (four in the federal constitution and four in the Commonwealth's), but he gives the Court no guidance as to how any of them apply, and the Court is disinclined to (and, given the timing of the trial, has no time to) do that research for him. To be sure, he asks for an oral argument, presumably for the purpose of amplifying his position, but his jury trial is scheduled for June 10, and his attorney is well aware that there is no time on the docket to schedule a hearing on this matter. Moreover, it is difficult to divine how evidence

would be necessary, so the only purpose of a hearing would be orally to argue the law, which could have been done in the brief itself.

Certainly, before the Court would consider opening the files for inspection, I would need more persuasive authority than the mere conclusory assertions contained in Broce's Motion. Although Broce erroneously drew the "good cause" language from *Eccles,* in another case, *Archer v. Mayes,* 213 Va. 630 (1973), the Virginia Supreme Court did hold that the trial court could permit an examination of the jury list "where good cause is shown." The Court also noted, however, that:

> [I]t cannot be inferred that the jury list shall be opened for inspection to members of the bar or private citizens without assigning good and sufficient reasons therefor. The proper administration of justice requires that the jury list be kept secret until the jurors are drawn for service, unless good cause be shown. The jury list is in no sense a public record to be exposed to the general public. Exposure of the list to the public could lead to tampering with and harassment of potential jurors and seriously affect their impartiality and the proper administration of justice.

*Id.* at 640-41.

Given persuasive reasons not to jeopardize the process, absent a showing of good cause or even a dim likelihood that Broce would unearth evidence to support the proposition he asserts, and after exploring the Order and the law applicable to it, we "arrive where we started and know the place for the first time." T. S. Eliot, *Four Quartets, Little Gidding.* I deny the Motion.