IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 14, 2020

## STATE OF TENNESSEE v. PRECIOUS BRIANA HORTON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2016-C-1417        Cheryl A. Blackburn, Judge**

_____

### No. M2019-00826-CCA-R3-CD

_____

A jury convicted the Defendant, Precious Briana Horton, of two counts of aggravated robbery, and the Defendant pleaded guilty to one count of theft of property valued under $500. The trial court sentenced the Defendant to eight years of incarceration. On appeal, the Defendant contends that: (1) the State exercised its preemptory challenges in a discriminatory manner; (2) the trial court erred when it excluded testimony regarding the Defendant's mental health; (3) the trial court prohibited her from offering to the jury her pretrial, out-of-court statement; and (4) the evidence is insufficient to sustain one of her aggravated robbery convictions. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ALAN E. GLENN, J., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Precious Briana Horton.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Megan M. King, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I. Facts

This case arises from an armed robbery that occurred on March 1, 2015, in Davidson County. For this incident, a Davidson County grand jury charged the Defendant with the aggravated robbery of each victim and also with theft. At the

Defendant's trial, the parties presented the following evidence:[1]  Emily Bullen testified that she and her friend, Kennalee Davis, were both students at Belmont University at the time of these events.  The two were shopping for materials with which to make costumes, so they went to Target at around 2:00 in the afternoon and, when they arrived, Ms. Bullen parked her four-door Mazda 6 toward the side of the store.  As they exited the car and headed toward the building, the Defendant approached them and said that her boyfriend had left her at the store and that she needed a ride to meet her aunt at Logan's Roadhouse, a restaurant.  Ms. Bullen said that she and Ms. Davis agreed to give the Defendant a ride, thinking that doing so was the "nice" thing to do.  Ms. Bullen recalled that the Defendant carried a twelve-inch purse that she hugged to her chest.

Ms. Bullen testified that the three women got into her car, with her and Ms. Davis sitting up front and the Defendant sitting in the back.  On the way to the steakhouse, the women were trying to make the Defendant feel better about her boyfriend leaving her, so they were saying things like, "boys are stupid," in comradery with her.  The Defendant at some point asked Ms. Bullen to take her to the parking lot in the Books-A-Million/Hobby Lobby parking lot.

Ms. Bullen said that, as she pulled into the parking lot, she heard a click and turned around to see the Defendant holding a gun.  The Defendant said that she had a daughter that she needed to take care of and said she needed Ms. Bullen's car.  The Defendant said that she did not want to hurt anyone.  Ms. Bullen said that she parked the car and asked the Defendant if there was any other way that they could work this out, and the Defendant said only if they gave her $1,000, which Ms. Bullen did not have.  Ms. Bullen gave the Defendant the $20 or $30 that she had with her at the time.  The Defendant said that she still needed the car, and Ms. Bullen gave it to her.  The Defendant then said that she would return the car at 8:00 p.m. to the same location.  Ms. Bullen and Ms. Davis exited the vehicle, and the Defendant climbed into the driver's seat.

Ms. Bullen described that she felt fearful during the course of this incident and stated that she only gave the Defendant her car and money because the Defendant had a gun.  After the Defendant drove away, Ms. Bullen and Ms. Davis went into the Books-A-Million store, calmed themselves as much as possible, and Ms. Davis called 911.  Ms. Bullen identified the 911 call, which records showed was placed at 3:00 p.m.  She recounted that Ms. Davis told the 911 operator that the Defendant had a gun.  After police arrived, Ms. Bullen and Ms. Davis gave them the Defendant's description.  Ms. Bullen said that, while police located her vehicle, neither the car nor her money was ever

---

[1] The Defendant raises an issue regarding the State's use of its peremptory challenges. We will summarize the facts as relevant to that issue below.

- 2 -

returned to her. Ms. Bullen identified her vehicle's registration, noting that her car was in her father's name.

During cross-examination, Ms. Bullen said that the Defendant appeared "shaken" and on the "verge of tears but not quite crying." Ms. Bullen said that she could not remember the color of the gun, and she was unsure whether the gun was one with chambers, like a revolver, or one that "slid." She said that, when she heard the click, the Defendant said, "Boys are full of shit and so am I." Ms. Bullen, curious, turned and looked at the Defendant who had a gun. Ms. Bullen recalled that the Defendant put the gun back in her purse before driving away in Ms. Bullen's vehicle.

Ms. Davis testified and confirmed many of the details given by Ms. Bullen. Ms. Davis added that, when the Defendant first approached the women, she held her purse to her chest "kind of a little protectively." Ms. Davis said that the Defendant appeared to be of a similar age to the women and was crying, so, while Ms. Davis felt unsettled, she wanted to help the Defendant out of sympathy. Ms. Davis also added that during the drive to Logan's the women talked, apologizing for the mess in the car, and the Defendant talked about her daughter "[i]n a disinterested way." Ms. Davis said that, because she felt unsettled, she wanted to keep an eye on the Defendant and was turned in the front seat, positioned so she could see the Defendant in the backseat. Ms. Davis recalled that the Defendant repeatedly checked her phone during the ride. As they approached Logan's, which appeared crowded, the Defendant asked the women to take her to Books-A-Million.

Ms. Davis testified that, as they were pulling into the parking lot, the Defendant pulled out a gun, which she described as a silver handgun with "a short barrel." Ms. Davis confirmed that the Defendant pointed the gun at Ms. Bullen and stated "Men are full of shit and so am I." The Defendant demanded the car or $2,000. Ms. Bullen gave the Defendant about $30 and her car, and Ms. Davis said that she did not have her purse with her, so she had nothing to give the Defendant. Ms. Davis said that she had items in the car, including her left-over lunch and the flip flops that Ms. Bullen had purchased for her for their class play.

Ms. Davis confirmed that, after this incident, the women went into the Books-A-Million where Ms. Davis called 911 using Ms. Bullen's phone. Ms. Davis offered the police the Defendant's description.

During cross-examination, Ms. Davis testified that she was unsettled by the Defendant asking for a ride, which made her nervous and talkative during the car ride. Ms. Davis said that the Defendant mentioned her daughter, and the three women discussed music and engaged in other small talk. When the conversation turned to why

the Defendant's boyfriend had left her, Ms. Davis found that the Defendant's story did not make sense. The Defendant said that she and her boyfriend had been in the lingerie section of Target when the Defendant accused her boyfriend of infidelity, causing her boyfriend to leave her at the store.

Ms. Davis said that, after the Defendant pulled out the gun, she told them that she did not want to hurt them, but Ms. Davis understood the Defendant to be implying that she would hurt them if necessary. The Defendant asked for the car and, at some point, the Defendant became emotional and started crying. Ms. Davis agreed that she did not "own" anything in the car because Ms. Bullen's grandparents had purchased the lunch from which she had kept the leftovers and Ms. Bullen had purchased the flip flops.

During redirect-examination, Ms. Davis agreed that the lunch in the car was hers, but she had not purchased it. Ms. Davis said that flip flops were something that the two girls were going to share, even though Ms. Bullen purchased them.

Byron Dewalt, an officer with the Metro Nashville Police Department ("Metro"), testified that he responded to the 911 call in this case. When he arrived between 3:00 and 3:30 p.m., he saw Ms. Bullen and Ms. Davis standing in front of the Books-A-Million store. He described them as "nervous" and "shaken up" as they provided him a description of both the events and the Defendant. Officer Dewalt said that he put the license tag number of the stolen vehicle into a national database of stolen items.

Jeanine Sarno, also an officer with Metro, testified that she responded to a call about a suspicious vehicle. When she arrived at the location, she saw a black Nissan parked in a driveway on Georgia Avenue. The Defendant was in the driver's seat of the vehicle, and a man was in the passenger seat. Officer Sarno also saw that a silver Mazda was in the back yard of the house "being stripped" and that one of the doors to the silver Mazda was in the back seat of the black Nissan. There was a tag in the trunk of the silver Mazda, and, when the officer ran the tag, it came back to a different but stolen vehicle. The tag came back as registered to a Chevrolet Astro van belonging to Jenny and Charles Scott. The VIN number on the silver Mazda revealed that the vehicle had been stolen. The tag to the stolen Mazda was located inside the black Nissan with the Defendant. The officer said that officers took the Defendant into custody.

The Defendant testified that she and her boyfriend had fought the night before this incident. She left their home in the morning to clear her head, and she spoke with him later by telephone. He met her at Target, and the two fought again, and he left her, so she began asking for a ride. She described her mental state as "just bad," saying that she was "nervous," and "shaky." She said that, while she was in the backseat of the car, she had "flashback" to when she was raped in the backseat of the car and "just went crazy." She

- 4 -

said that she yelled that she was going to get out of the car and that she was going to beat up the other women and told them to "get the f*** out of the car." The Defendant testified that she did not have a weapon or pretend to have a weapon.

The Defendant said that she knew that she had done something wrong and wanted to tell the truth about this incident. She agreed that when she first spoke with police she told them that she had purchased the car for $1,200. She said that she was scared, as this was her first encounter with the police. She apologized for the incident but reiterated that she did not have a gun.

During cross-examination, the Defendant stated that, when Officer Sarno arrived, the Defendant was in the driver's seat of a black Nissan, with a man as her passenger. The front passenger door of Ms. Bullen's vehicle was in the backseat of the Nissan, along with Ms. Bullen's vehicle registration and license tag. She agreed that she admitted to police that she was "taking apart" Ms. Bullen's silver, four door Mazda. The Defendant agreed that she had pleaded guilty to taking Mr. and Mrs. Scott's license plate, which she took off his car without his permission.

The Defendant agreed that she lied to the police when she stated that she had purchased Ms. Bullen's car two months prior to this incident. She told police that she paid cash for the vehicle and could not get the title put in her name because she did not have a bill of sale. It was not until the officer told her that he was going to conduct a lineup that included her and show it to the victims, that the Defendant admitted that she had stolen the vehicle. She also admitted in her statement to police that her boyfriend had not left her at Target but that she was there by herself. The Defendant said that, at the time she took Ms. Bullen's car, she did not have a sick child for whom she needed money. If she told the victims this, it would have been a lie.

During redirect-examination, the Defendant testified that law enforcement did not find a gun in her possession. During re-cross examination, the Defendant testified that she took the car on March 1, 2015, and was not arrested until March 16, 2015.

Based upon this evidence, the jury convicted the Defendant of two counts of aggravated robbery. The Defendant then pleaded guilty to theft of property valued at $500 or less. The trial court sentenced the Defendant to eight years for each aggravated robbery conviction and to eleven months and twenty-nine days for the theft conviction, and it ordered that all the sentences run concurrently for a total effective sentence of eight years.

It is from these judgments that the Defendant now appeals.

## II.  Analysis

On appeal, the Defendant contends that: (1) the State exercised its peremptory challenges in a discriminatory manner; (2) the trial court erred when it excluded testimony regarding the Defendant's mental health; (3) the trial court prohibited her from offering to the jury her pretrial, out-of-court statement; and (4) the evidence is insufficient to sustain one of her aggravated robbery convictions.

### A.  Peremptory Challenges

The Defendant contends that the State struck prospective jurors without a race-neutral reason, in violation of the law as articulated by the United States Supreme Court in *Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (holding that peremptory challenges may not be exercised in a discriminatory manner).  The State counters that the record evinces that it had race-neutral reasons for using peremptory challenges against six prospective jurors and did so without furthering a discriminatory purpose.

"Peremptory challenges, along with challenges for 'cause', are the principal tools that enable litigants to remove unfavorable jurors during the jury selection process." *State v. Spratt*, 31 S.W.3d 587, 598 (Tenn. Crim. App. 2000) (quotations omitted).  A peremptory challenge allows for the removal of jurors who may exhibit hostility or bias but whose removal for cause has not been established.  *Id.*

Since as early as 1880, the United States Supreme Court has consistently recognized that racially-based juror exclusions affect and injure the integrity of the justice system.  *See Woodson v. Porter Brown Limestone Co.,* 916 S.W.2d 896, 902 (Tenn. 1996) (citing *Carter v. Jury Comm'n of Green County*, 396 U.S. 320 (1970); *Ballard v. United States*, 329 U.S. 187 (1946); *Hollins v. Oklahoma*, 295 U.S. 394 (1935); *Norris v Alabama* 294 U.S. 587 (1935); *Strauder v. West Virginia*, 100 U.S. 303 (1880)).  In *Batson v. Kentucky*, 476 U.S. 79, 87 (1986), the United States Supreme Court held that a criminal defendant could challenge the exclusion of racial minorities on equal protection grounds.  *Id.* at 90; *State v. Hugueley*, 185 S.W.3d 356, 368 (Tenn. 2006).  The Court held that the equal protection clause guarantees a defendant that the State will not exclude members of a defendant's race from the venire on account of race.  *Batson,* at 97-98.

The *Batson* Court outlined a three step process for raising the equal protection challenge.  First, the defendant must make a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race.  *Purkett v. Elem*, 514 U.S. 765, 767 (1995); *Batson*, 476 U.S. at 96-98.  A defendant "may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an interference of discriminatory purpose." *Id.* at 93-94.  Under this first step, the defendant

need not establish that the State's challenge was "more likely than not the product of purposeful discrimination." *Johnson v. California*, 545 U.S. 162, 170 (2005). A defendant can establish a prima facie case merely by demonstrating that the State excluded members of a cognizable racial group for the jury pool. *State v. Echols*, 382 S.W.3d 366, 281 (Tenn. 2012); *State v. Joan Odell*, No. W2018-013410CCA-R3-CD, 2019 WL 6499438, at * 6 (Tenn. Crim. App., at Jackson, Dec. 3, 2019), *no Tenn. R. App. P. 11 application filed.* Furthermore, "the exercise of even one peremptory challenge in a purposefully discriminatory manner would violate equal protection." *State v. Ellison*, 841 S.W.2d 824, 827 (Tenn. 1992) (concluding that *Batson* applied even though only one member of the venire belonged to the cognizable racial group).

The second prong of *Batson* requires that, if the defendant satisfies this initial burden, the burden then shifts to the prosecutor to articulate a race-neutral explanation for excluding the venire member in question. *Purkett*, 514 U.S. at 767; *Batson*, 476 U.S. at 97. The prosecutor may not merely assert that the reason for the challenge was not discriminatory. *Ellison*, 841 S.W.2d at 827. The State's race-neutral reason explanation "must be a clear and reasonably specific account of the prosecutor's legitimate reasons for exercising the challenge . . . [but] need not be persuasive, or even plausible." *Hugueley*, 185 S.W.3d at 368 (citing *Batson*, 476 U.S. at 97; *Purkett v. Elem*, 514 U.S. 745, 767-68 (1995)). The State's explanation need not include a reason that would justify excusing the juror for cause. *Batson*, 476 U.S. at 97. "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race[-]neutral.'" *Hugueley*, 185 S.W.3d at 368 (quoting *Purkett*, 514 U.S. at 768).

Third and finally, the trial court must determine whether the defendant met his burden of proving purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 359 (1993); *Batson*, 476 U.S. at 98. "'The trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual.'" *State v. Kiser*, 284 S.W.3d 227, 255 (Tenn. 2009) (quoting *Hugueley*, 185 S.W.3d at 368). In making its determination of whether use of a peremptory challenge was discriminatory, the trial court must articulate specific reasons for each of its factual findings. *Woodson*, 916 S.W.2d at 906. .

"[D]etermination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence." *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994). The United States Supreme Court has recognized that a defendant may present a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race, including: (1) statistical evidence comparing the prosecutor's use of peremptory strikes against African-American jurors and Caucasian jurors in the case; (2) the prosecutor's disparate questioning of African-American and Caucasian jurors in the case;

(3) "side-by-side comparisons" of African-American jurors who were struck and Caucasian jurors who were not challenged; (4) the "prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing; (5) relevant history of the State's use of peremptory strikes in past cases; or (6) any other relevant circumstances bearing upon the issue. *Flowers v. Miss.*, 139 S. Ct. 2228, 2243 (2019). "When a prosecutor misstates the record in explaining a strike, that misstatement can be another clue showing discriminatory intent." *Id.* at 2250. A prosecution's shifting of reasons for the strike also suggests that the reasons may be pretextual. *Frost v. Chatman*, 136 S. Ct. 1737, 1751 (2016).

"[T]he ultimate burden of establishing purposeful discrimination lies with the party objecting to the peremptory challenge." *Hugueley*, 185 S.W.3d at 374 (citing *Batson*, 476 U.S. at 93). When ruling on a *Batson* challenge, the trial court must give specific reasons for each of its factual findings, including: (1) whether a prima facie case has been established; (2) whether a race-neutral reason for the challenge has been provided; and (3) whether the totality of the circumstances supports a finding of purposeful discrimination. *Id.* at 369 (citing *Woodson,* 916 S.W.2d at 906). The trial court's findings are imperative because rarely will a trial record alone provide a legitimate basis from which to substitute an appellate court's opinion for that of the trial court. *Woodson*, at 916. Thus, on appeal, the trial court's finding that the State excused a venire member for race-neutral reasons will not be reversed unless it is clearly erroneous. *Id.*

In the case under submission, the trial court found that the Defendant was black and that State had exercised six peremptory challenges, four of which were exercised against African-American potential jurors and two of which were exercised against potential jurors of Middle Eastern or Arabic descent. The trial court stated, "I can honestly say I don't see any prima facie case here on its face." The trial court went on to ask the parties to present their reasons for challenging the respective jurors. After hearing their respective reasoning, the trial court found that the Defendant had not made a prima facie showing that a *Batson* violation had occurred. It is apparent that the trial court found that the State had offered race-neutral reasons for each of its challenges and that the totality of the circumstances did not support a finding of purposeful discrimination. While the record is adequate for our review, we would encourage the trial court to examine *Woodson* and *Huguely* and, in the future, articulate specific reasons for its findings, including whether the State has offered a race-neutral explanation for its peremptory strike and whether the totality of the circumstances support a finding of purposeful discrimination.

The trial court in this case found that the Defendant had not made a prima facie showing of a *Batson* violation. It noted that, while the State had exercised six of its seven

peremptory challenges against minorities, the jury was comprised of five African-Americans jurors, one other minority juror, and six Caucasian jurors. Because the trial court then asked the prosecutor to offer its race-neutral explanations, and then made a finding that the Defendant had not proven a *Batson* violation, we will review the State's reasoning in this regard. *See Hugueley*, 185 S.W.3d at 371 (although the trial court failed to make a specific finding that a prima facie discrimination had been made, "[n]evertheless, the prosecutor's response to each objection clearly implies that the trial court expected the State to proffer its reasons"); *see also Woodson*, 916 S.W.2d at 905 (holding that, even when the trial court made no explicit finding, it was proper to conclude that the objecting party had made a prima facie case "[o]therwise, the court would not have required the [striker] to explain the challenge"). While the trial court's findings are "barely adequate to permit our review," similar to those in *Woodson*, we conclude that a close examination of the record evinces that the prosecution's exercise of its peremptory challenges was for race-neutral reasons. *See id.* at 373.

"In reviewing the prosecutor's explanations, we acknowledge that 'many of the judgments made by counsel in picking a jury are purely intuitive and based upon inarticulable factors.'" *State v. Carroll*, 34 S.W.3d 317, 320 (Tenn. Crim. App. 2000) (quoting *United States v. Bently-Smith*, 2 F.3d 1368, 1374 (5th Cir. 1993)). Accordingly, while subjective considerations may not be susceptible to objective rebuttal or verification, they are permitted because of the inherent nature of peremptory challenges, with the understanding that ultimate *Batson* findings will largely turn on the evaluation of the credibility of counsel's explanations. *Id.* Neutral explanations that are based on subjective assessments, such as the juror's demeanor, must be carefully scrutinized. *Id.* At this step, the crucial inquiry is the facial validity of the prosecutor's explanation. *Hernandez*, 500 U.S. at 360. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral. *Id.* Indeed, what *Batson* means by a "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection. *Purkett*, 514 U.S. at 769 (citations omitted); *see also State v. George Arthur Lee Smith, Nathanial ("Nat") Allen, and Shannon Lee Jarnigan*, No. E2006-00984-CCA-R3-CD, 2007 WL 4117603, at *1 (Tenn. Crim. App., at Knoxville, Nov. 19, 2007), *perm. app. denied* (Tenn. Feb. 25, 2008).

According to the trial court's jury pool list, the State exercised seven peremptory challenges, five to strike people of African-American descent and two to strike people of Arabic decent. The State challenged: Juror Marthel; Juror Crowder; Juror Jordan; Juror Burdalic; Juror Gad; Juror Foote; and Juror Posey.[2]

---

[2] We note that the defense exercise a peremptory challenge to exclude an African-American, Juror Cook, from the venire.

Juror Marthel. The record evinces that Juror Marthel, a woman of African-American descent, admitted that she was a person who had difficulty being fair and impartial if there was no video evidence or if the proof was "hearsay." She also said that she had been kidnapped when she was in her early twenties and had to testify about the kidnapping. She further stated that this experience would not affect her ability to be a juror. The State explained that it asked Juror Marthel whether, because there was no video, she could make a decision about guilt in this case. Juror Marthel responded that she "really would like to see a video." The State talked with the juror and eventually the juror appeared to be fine with evaluating the case with no video, but her stance was concerning to the State since there was no video evidence in this case. It therefore exercised a peremptory challenge against her.

Juror Crowder. The record evinces that Juror Crowder, a woman of African-American descent, testified that she had ten children and was disabled to some extent but capable of doing most things. The record shows that the juror mentioned that she could not hear a question being asked. The State said that Juror Crowder was an "elderly lady" and had trouble hearing. The State said that, four times, it asked her about a spouse, and "she wasn't hearing" the questions. The State said that it was also concerned that, because she was elderly, she may be more sympathetic to the defense, but that their main issue with this juror was her apparent hearing impairment. It therefore exercised a peremptory challenge against her.

Juror Jordan. The record evinces that Juror Jordan, a man of African-American descent, was a substitute teacher and had testified as a character witness for a friend convicted of robbery a year before the Defendant's trial. The trial court noted that the State's notes indicated that Juror Jordan had a brother in prison for robbery and had testified for a friend who had committed robbery.

Juror Burdalic. The record evinces that Juror Burdalic, who the trial court said appeared to be of Arabic descent, was a full-time student majoring in psychology and majoring in sociology, with an aim to enter the field of health counseling. He stated that his brother was incarcerated for a robbery that occurred in Davidson County, and he learned about his conviction shortly before the Defendant's trial.

Juror Gad. The record evinces that Juror Gad, a man who appeared to be of Middle Eastern descent, was a twenty-four-year-old medical student. The State informed the trial court that Juror Gad was a medical student. The State said that it was concerned that, if the defense raised the issue of mental health, that Juror Gad may put too much weight on that and want to talk about mental health to the other jurors. It therefore exercised a peremptory challenge against him.

Juror Foote.  The record evinces that Juror Foote, a woman of African-American descent, stated that she had a "large family" and that the Defendant may be her son-in-law's cousin.  She said that she did not personally know the Defendant but that they two may be related.  Additionally she stated that she there were multiple members of her family who had been arrested and spent time incarcerated.  She said that her son and brothers had been convicted of drug-related offenses and that her son had not been treated fairly by the justice system.  The State exercised its peremptory challenge based upon the potential that Juror Foote was related to the Defendant.

Juror Posey.  The record evinces that Juror Posey, a woman of African-American descent, said that her sister had been charged with an offense similar to robbery and that her father had been charged with domestic violence, both in Davidson County.  She stated that she could not say whether her family had been treated fairly by the justice system and stated that she had appeared in court on her sister's behalf.

After reviewing each of these jurors responses to the questions posed by the parties during voir dire and the State's articulated reasoning for exercising its peremptory challenges, we are satisfied that the prosecutor provided a facially race-neutral reason for the challenges to these jurors.  The jury was comprised of five jurors that were non-Caucasian, and the State had not exercised all of its peremptory challenges at the time that these five non-Caucasian jurors were sworn.  While this does not in and of itself convince us that the State's proffered race-neutral reasons for excusing the seven potential jurors were merely pretextual, our close review of the transcript reveals no disparate treatment based upon race.  We therefore conclude that the trial court did not err when it determined that, under all the circumstances, the Defendant failed to establish purposeful discrimination.

**B.  Mental Health Testimony**

The Defendant next contends that the trial court erred when it granted the State's motion in limine prohibiting the Defendant from presenting evidence of her mental health condition during the trial.  She states that her family members should have been able to testify as laypersons about her mental health conditions.  Further, she asserts the trial court erred when it limited her testimony about a prior trauma, namely a rape experience, which she contends caused her to act in "a manner without recognition of what she was doing and rendered her unable to recall what happened during the incident."  The State counters first that the Defendant withdrew her request to call an expert witness, waiving her right for our review.  The State further contends that the Defendant has waived the exclusion of the lay witnesses because she failed to make an offer of proof, citing *State v. Hall*, 958 S.W.2d 679 (Tenn. 1997).  The State finally contends that the trial court did not

abuse its discretion when it limited the Defendant's own testimony about her mental health.

"Generally speaking, the trial court is afforded broad discretion in resolving questions concerning the admissibility of expert testimony; in consequence, we will not overturn its ruling on appeal absent a finding that it abused its discretion." *State v. Ferrell*, 277 S.W.3d 372, 378 (Tenn. 2009) (citations omitted). Diminished capacity

> is not considered a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but mostly likely guilty of a lesser included offense. Thus, a defendant claiming diminished capacity contemplates full responsibility, but only for the crime actually committed.

*Hall*, 958 S.W.2d at 688 (citations omitted). Such evidence is usually introduced through expert testimony showing that a defendant was incapable of forming the requisite criminal intent due to an impaired mental condition. *State v. Adams*, 405 S.W.3d 641, 660-61 (Tenn. 2013) (citations omitted).

In the case under submission, the Defendant's brief is unclear. She cites and quotes from the law regarding expert witnesses, but then states "[the] law does not require that evidence of mental illness that affects the *mens rea* of a defendant be exclusively from a mental health expert to be admissible for the defense." She posits that "[t]he Court erred when it limited [her] testimony and her ability to present proof relating to her mental health diagnosis." Before trial, the Defendant informed the trial court that she would not be calling an expert witness but wanted to call lay witnesses to testify about her mental state. On appeal, the Defendant's brief contends that the trial court erred when it limited potential witnesses. She states that her "witnesses, specifically family members that were familiar with her condition, should have been permitted to testify about her mental health conditions and the impact that condition had on her" and that she herself should have been able to testify about her mental health condition. Thus, it appears that the Defendant is not actually complaining about the limitation of any expert witness but the limitation of the testimony of lay witnesses, namely family members, and limitations of her own testimony about her mental health.

Tennessee Rule of Evidence 103 specifically discusses a trial court's error regarding the admission or exclusion of evidence. Rule 103(a)(2) states, in pertinent part:

> Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

. . . .

> (2) Offer of proof.   In case the ruling is one excluding evidence, the substance of the evidence and the specific evidentiary basis supporting admission were made known to the court by offer or were apparent from the context.

This rule requires a party seeking admission of the evidence to make an offer of proof unless the substance of the evidence and the evidentiary basis supporting the evidence's admission is apparent under the circumstances. *Id.*  The purpose of an offer of proof is to preserve excluded evidence in a manner sufficient to allow appellate review of the trial court's decision to exclude the evidence. *State v. Lowe*, 552 S.W.3d 842, 864 (Tenn. 2018).  Our supreme court has previously recognized:

> In order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner. When it is a document or exhibit this is done simply by having the exhibit marked for identification only and not otherwise introduced.   When, however, it consists of oral testimony, it is essential that a proper offer of proof be made in order that the appellate court can determine whether or not exclusion was reversible.

*State v. Goad*, 707 S.W.2d 846, 852-53 (Tenn. 1986); *see also Alley v. State*, 882 S.W.2d 81, 816 (Tenn. Crim. App. 1994) ("When a party contends that the trial court erred in excluding testimony, the need for a description of that testimony is compelling.  Absent such a showing, an appellate court cannot determine whether the exclusion was error, and if error is found, whether the error is harmless.").  The Tennessee Supreme Court has routinely held that the failure to make an offer of proof following a trial court's exclusion of evidence results in waiver of the issue on appeal. *State v. Sims*, 45 S.W.3d 1, 15 (Tenn. 2001).

In the case under submission, the substance of the testimony the Defendant sought to present about her mental health "disorder" is not apparent from the record.  The Defendant made no offer of proof regarding any "disorder."  The Defendant did mention during the trial a traumatic event that happened to her while she was in the backseat of a vehicle, testimony which the trial court excluded, but she made no offer of proof regarding this traumatic event or any resulting mental health disorder.  As such, we are unable determine whether the trial court's exclusion of any such testimony was error or whether any error, if it did exist, is harmless.  The Defendant is not entitled to relief on this issue.

- 13 -

## C. The Defendant's Statement

The Defendant contends that the trial court prohibited her from offering to the jury her interview with law enforcement after arrest. This, she argues, prejudiced her because the State had questioned her about portions of the statement, leaving the jury with an "incomplete picture of the statement that [she] had given to the police after her arrest." The State counters that the Defendant waived this issue because she did not move to admit the statement at trial and failed to included the statement in the appellate record preventing our review either on the merits or for plain error. We agree with the State.

A defendant has the burden of ensuring that the record on appeal is "sufficient to convey a fair, accurate, and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(a); *State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993). Plenary review, much less plain error review, is precluded when the appealing party fails to include that portion of the record upon which the party relies. *Id.* The Defendant failed to make an offer of proof of her statement to police, and the statement is not included in the record. As previously stated, the purpose of an offer of proof is to preserve excluded evidence in a manner sufficient to allow appellate review of the trial court's decision to exclude the evidence, and is done by simply having the statement marked for identification only. *See Lowe*, 552 S.W.3d at 864; *see also Goad*, 707 S.W.2d at 852-536. The Defendant's failure to make an offer of proof following the trial court's exclusion of her statement results in her waiving of the issue on appeal. *See Sims*, 45 S.W.3d at 15; *see also State v. Charles Owens*, No. M2005-02571-CCA-R3-CD, 2007 WL 1094136, at *22 (Tenn. Crim. App., at Nashville, Apr. 12, 2007), *perm. app. denied* (Tenn. Aug. 20, 2007) (holding that a defendant to preserve the record for appellate review of whether the trial court properly excluded his statement to a detective when he failed to include his statement to the detective in the record). The Defendant is not entitled to relief on this issue.

## D. Sufficiency of Evidence

The Defendant next contends that the evidence is insufficient to sustain her conviction for the aggravated robbery of Ms. Davis because "none of the items taken by [the Defendant] during the robbery belonged to [Ms. Davis] . . ." including the vehicle itself. The State counters that there was sufficient evidence from which a reasonable jury could find that the State had proven the elements of aggravated robbery beyond a reasonable doubt. We agree with the State.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at

775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

The Defendant contends that the evidence is insufficient to sustain her conviction for the aggravated robbery of Ms. Davis because Ms. Davis did not own anything in the vehicle or own the vehicle itself. Robbery, a Class C felony, "is the intentional or knowing theft of property from a person of another by violence or putting the person in fear." T.C.A. § 39-13-401 (2019). As relevant to this case, aggravated robbery, a Class B felony, is robbery as defined above, "Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-402(a)(1), (b) (2019). "A person commits theft of property if, with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2019).

We again note that, upon review, we view the evidence in the light most favorable to the State. The evidence showed that Ms. Bullen and Ms. Davis were out purchasing items for a school project on the day of this offense. They had purchased multiple pairs of flip flops, which Ms. Bullen said she purchased for herself and for Ms. Davis. Ms. Davis had also saved the remainder of her lunch to eat at a later date and had it with her in the car. The Defendant asked the women for a ride, got into the backseat of Ms. Bullen's vehicle, and directed them to a Books-A-Million parking lot. In the parking lot she pulled a gun from her handbag and pointed it at Ms. Bullen, causing both Ms. Bullen and Ms. Davis to be in fear. The Defendant told the women to exit the vehicle, and they both complied. She then got into the front seat of the vehicle and drove away with the vehicle and all of the contents that it contained. We conclude that, based upon this evidence, a rational jury could conclude that the Defendant had exercised control over Ms. Davis's property, including her lunch and her flip flops, and that her actions met the other elements of aggravated robbery. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's conviction, and she is not entitled to relief on this issue.

## II. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE